**COCA–COLA BOTTLING COMPANY OF SHREVEPORT, INC., et al., Plaintiffs,**

v.

**The COCA–COLA COMPANY, A Delaware Corporation, Defendant.**

**ALEXANDRIA COCA–COLA BOTTLING COMPANY, LTD., et al., Plaintiffs,**

v.

**The COCA–COLA COMPANY, A Delaware Corporation, Defendant.**

**Civ. A. Nos. 83–95, 83–120.**

United States District Court, D. Delaware.

April 29, 1983.

---

Edmund N. Carpenter, II, Charles F. Richards, Jr., Jesse A. Finkelstein, and Thomas A. Beck, Richards, Layton & Finger, Wilmington, Del., for plaintiffs and intervenors; Emmet J. Bondurant, H. Lamar Mixson, Thomas B. Metzloff, and Deborah J. Merritt, Bondurant, Miller, Hishon & Stephenson, Atlanta, Ga., Roger N. Nanovic, Bondurant, Miller, Hishon & Stephenson, Jim Thorpe, Pa., Epperson, Goodpaster & Johnsen, Tulsa, Okl., Miles J. Alexander, Kilpatrick & Cody, Atlanta, Ga., of counsel.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant; Frank C. Jones, Michael C. Russ, and George S. Branch, King & Spalding, Atlanta, Ga., Jerome Gilson, Hume, Clement, Brinks, Willian & Olds, Ltd., Chicago, Ill., of counsel.

**MURRAY M. SCHWARTZ, District Judge.**

Multimedia advertising proclaims "Coke is it," but what is "it"? Is diet Coke "it"? These are some of the questions currently before the Court. The plaintiffs [1] in these

---

1. The plaintiffs in Civil Action No. 83–95 are: Coca-Cola Bottling Company of Shreveport, Inc.; .Coca-Cola Bottling Company of Elizabethtown, Inc.; Owensboro Coca-Cola Bottling Company, Inc.; Texarkana Coca-Cola Bottling Company; Coca-Cola Bottling Company (San Diego); Las Cruces Coca-Cola Bottling Company; The Coca-Cola Bottling Company of Tucson, Inc.; Jackson Coca-Cola Bottling Company; Wichita Coca-Cola Bottling Company; Permian Coca-Cola Bottling Company; Marshall Coca-Cola Bottling Company; Coca-Cola Bottling Company of Tulsa, Inc.; Dixie Coca-Cola Bottling Company, Incorporated; Wilmington Coca-Cola Bottling Works, Incorporated; New Bern Coca-Cola Bottling Works, Inc.; Kelford Coca-Cola Bottling Company, Inc.; Magnolia Coca-Cola Bottling Company, Inc.; and The Coca-Cola Bottling Company (Fort Smith). By Order dated April 7, 1983 the Court granted motions for permissive intervention pursuant to Fed.R.Civ.P. 24(b)(2) on behalf of: Coca-Cola Bottling Co. of Jamestown; Hattiesburg Coca-Cola Bottling Co.; Plymouth Coca-Cola Bottling Co., Inc.; Sacramento Coca-Cola Bottling Co., Inc.; Natchez Coca-Cola Bottling Co., Inc., and Central Coca-Cola Bottling Co. Docket Item ("Dkt.") 99. The Court conditionally granted Decatur Coca-Cola Bottling Co. status as a permissive intervenor. Dkt. 102. These plaintiffs are known as "unamended bottlers." *See infra* page 1126.

The plaintiffs in Civil Action No. 83–120 are: Alexandria Coca-Cola Bottling Co., Ltd., and

two unconsolidated lawsuits seek declaratory, injunctive and monetary relief against the Coca-Cola Company (the "Company") based upon allegations of breach of contract, violation of two 1921 Consent Decrees,[2] trademark infringement, dilution of trademark value, and federal antitrust violations, all of which concern the Company's introduction of diet Coke. Jurisdiction is based upon 28 U.S.C. §§ 1332, 1338, 2201; 15 U.S.C. §§ 1114, 1121, 1125; and 15 U.S.C. §§ 15, 16. Pending before the Court is plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65. Upon consideration of the voluminous briefs and affidavits submitted by the parties and the argument heard on April 7, 1983, the Court, for the reasons that follow, will deny the motion for a preliminary injunction.

## I. *Background*

While the genealogy of the Coca-Cola family has been examined judicially many times, including this Court's recent opinion in *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*, 98 F.R.D. 254, (D.Del.1983), it is virtually impossible to consider the substance of the lawsuit without a basic understanding of the family tree.

### A. *The Coca-Cola Family*

In 1886, an Atlanta pharmacist, Dr. J.S. Pemberton, created the syrup for a soda fountain beverage and named it Coca-Cola.[3] In 1887, the name was registered as a trademark in the United States Patent Office. In exchange for $2,300, Asa Chandler acquired the Coca-Cola trademark and for-

mula in 1888 and in 1892 formed The Coca-Cola Company as a Georgia corporation.

Prior to 1899, Coca-Cola was sold primarily as a fountain drink but in that year the Company entered into a contract with two Chattanooga, Tennessee, lawyers, B.F. Thomas and J.B. Whitehead, granting them the exclusive right to purchase Coca-Cola syrup ("Bottler's Syrup") at a fixed price, use the Coca-Cola trademarks, and sell Coca-Cola throughout the United States in bottles or other receptacles.[4] The Company retained the right to manufacture and sell syrup, and to market fountain Coca-Cola.[5] In December 1899, Whitehead and Thomas formed a Tennessee corporation known as Coca-Cola Bottling Company. Bottling plants were established in Chattanooga and Atlanta.

In 1900, due to a disagreement over the best method to develop the bottling business, Coca-Cola Bottling Company divided its territory into two parts. Thomas retained ownership of Coca-Cola Bottling Company which conveyed to Whitehead and his new business associate, J.T. Lupton, all of the rights that Coca-Cola Bottling Company had under the 1899 contract to certain states in the newly divided territory. Whitehead and Lupton formed a Tennessee corporation originally named Dixie Coca-Cola Bottling Company, which later changed its name to The Coca-Cola Bottling Company.[6]

In 1902, the Company granted the right to bottle Coca-Cola in Texas to Whitehead-Lupton, who in turn granted one-third of its interest in Texas and Oklahoma to E.D. Twinam. This right to Texas and Oklaho-

---

Coca-Cola Bottling of Presque Isle, Maine. These plaintiffs are known as "amended bottlers." *See infra* page 1126. All references to docket items in Civil Action No. 83–120 will be in the form of "Dkt. (83–120)".

**2.** Coca-Cola Bottling Co. v. The Coca-Cola Co., Nos. 388 & 389 (D.Del. October 4, 1921) ("1921 Consent Decrees" or "Consent Decrees"). For a discussion of the litigation which gave rise to and the substance of the Consent Decrees, *see infra* pages 1125–1126.

**3.** Throughout this opinion the names "Coca-Cola" and "Coke" will be used interchangeably.

Similarly, no distinction will be made between "diet Coke" and "diet Coca-Cola."

**4.** The contract did not include the six New England states, Texas, and Mississippi.

**5.** The contract is reproduced in full at *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796, 800–01 (D.Del.1920).

**6.** In an effort to avoid confusion, Coca-Cola Bottling Company will be referred to as "Thomas" and The Coca-Cola Bottling Company will be referred to as "Whitehead-Lupton."

ma held by Whitehead-Lupton and Twinam was then transferred to a new corporation which became known as The Coca-Cola Bottling Company (1903) ("1903 Company"). In 1916, the Company granted the exclusive right to bottle Coca-Cola in the six New England states to Monroe Bickart who formed the New England Coca-Cola Bottling Company ("New England").

These four companies—Thomas, Whitehead-Lupton, 1903 Company, and New England—became known as "parent bottlers." [7] The parent bottlers did not actually bottle Coca-Cola themselves; rather, they contracted with other individuals and entities to bottle and sell Coca-Cola in exclusive specifically designated geographic territories. These bottlers became known as "actual" or "first-line" bottlers. The first-line bottlers often further divided their exclusive geographic territories amongst "sub-bottlers." The system that developed functioned as follows: The Company manufactured Bottler's Syrup which in turn was sold to the parent bottlers. The parents or sub-parents then resold the syrup to the actual bottlers at a higher price.[8]

Between 1899 and 1915 the contracts between the parent bottlers and the Company, which gave the parents the right to purchase Bottler's Syrup at a fixed price per gallon, may have been amended to adjust the price of Bottler's Syrup. In 1915, the contracts were amended to conform with changes of the Clayton Act. Dkt. 63, ¶ 26 Exh. F–1, F–2 (Second Affidavit of Emmet J. Bondurant). The parent bottlers modified their contracts with their first-line bottlers to reflect these changes. *Id.* at ¶ 28. These modifications were carried out through the use of standardized printed contracts. ("Bottler's Contracts").[9]

In 1918, the Company was purchased by a banking syndicate and became a Delaware corporation, assuming the obligations to the parent bottlers. The new corporation entered into an agreement with the principal parent bottlers in December of 1919 to permit the Company to pass on cost increases of sugar in excess of nine cents per pound to the parent bottlers. Due to the high cost of sugar after World War I, the Company sought to enter into new contracts with the parents which would allow the Company to raise Bottler's Syrup prices at will. The parent bottlers rejected this proposal and the Company informed the parents that their contracts were terminable at will and gave notice of termination. In response, Whitehead-Lupton and Thomas instituted suits against the Company in this Court.[10]

In *Coca-Cola Bottling Co. v. The Coca-Cola Co.,* the Court granted the parents' motion for a preliminary injunction holding that their contracts were perpetual. 269 F. at 816. While an appeal was pending, the parties executed settlement agreements which were incorporated by the Court as final judgments on October 4, 1921. These constituted the 1921 Consent Decrees.

The Consent Decrees also amended the 1899 contracts, as amended in 1915, between the Company and the parents. The Consent Decrees provided, *inter alia:* first, that the parents' contracts with the Company were perpetual; second, that Coca-Cola Bottler's Syrup contain no less than 5.32 pounds of sugar per gallon; third, that the cost of Bottler's Syrup to the parents would be no less than $1.17½ per gallon and that the first-line bottlers would pay a maximum of $1.30 per gallon; fourth, that the price of Bottler's Syrup could increase based upon the increase in the market price of sugar as quoted quarterly by the ten

---

7. The parent bottlers formed other companies known as "sub-parent" bottlers which performed the function of parent bottlers within specified geographic territories.

8. The Company's manufacture and sale of fountain syrup was not encompassed by this arrangement.

9. Examples of Bottler's Contracts are contained in Dkt. 63, Exh. G; Dkt. 1, Exh. A, D, L, R. While some differences exist between the forms used by the various parents, the Bottler's Contracts are substantially identical.

10. Six first-line Whitehead-Lupton bottlers, members of the Coca-Cola Bottlers' Association, *see infra* note 23, intervened in support of the parent bottlers.

largest refineries in the United States; and fifth, that the parents would have the exclusive right to use the trade name and trademark Coca-Cola in their exclusive territories.

The settlement with Whitehead-Lupton was temporarily conditioned on Whitehead-Lupton's attempt to obtain acceptance of the modification of its first-line Bottler's Contracts to conform with the Consent Decrees.[11] Dkt. 1, Exh. 5, ¶¶ 15, 16. The Thomas bottlers had two-year term contracts, most of which had expired during the litigation. Thomas executed perpetual new form Bottler's Contracts which conformed to the Consent Decrees.

Between 1923 and 1975, the Company acquired and dissolved all of the parent and sub-parent bottlers. Dkt. 55, Exh. 7, ¶ 17 (Affidavit of Charles L. Wallace). The Company, therefore, has succeeded to the rights and obligations of all the parent bottlers, and today sales of Bottler's Syrup are made directly from the Company to the actual bottlers.[12] The price of Bottler's Syrup during this period was governed by the price formula established by the 1921 Consent Decrees.

Beginning in 1978, the Company sought amendments to its contracts with all first-line bottlers to permit a new formula for pricing Bottler's Syrup which would utilize a "sugar element," a "base element," and the Consumer Price Index. The sugar element expands the period for adjustments from the prior quarterly system and provides for adjustments based on the quoted market price of any sweetening ingredient used in Bottler's Syrup. As of this date, approximately 339 first-line bottlers, representing approximately 90 percent of the domestic volume of Coca-Cola sales, have signed the 1978 Amendment. These bottlers are generally known as "amended bottlers." Approximately 83 first-line bottlers are "unamended bottlers" who continue to operate under Bottler's Contracts which basically conform to the 1921 Bottler's Contracts entered after the 1921 Consent Decrees.[13]

Beginning in 1980, the Company began substituting high fructose corn syrup ("HFCS–55") for approximately 50 percent of the granulated sugar in the Bottler's Syrup sold to amended and unamended bottlers. Due to the 1978 Amendment's formula, the amended bottlers receive a pass-through of the savings realized by the Company by the substitution of HFCS–55 which costs less than granulated sugar.[14] The substitution of HFCS–55 has spawned litigation in this Court by a group of unamended bottlers who claim that their Bottler's Contracts entitle them to Bottler's Syrup made only with granulated sugar, which they assert does not include HFCS–55, and that the price paid by the bottlers should reflect the actual price paid by the Company for granulated sugar rather than the list price. The unamended bottlers also

---

**11.** As of 1921, the Whitehead-Lupton first-line bottlers had perpetual contracts with terms based upon the 1915 modification of the 1899 contract between the parents and the Company.

**12.** There are approximately 422 first-line bottlers at this time.

**13.** Several plaintiffs in Civil Action No. 83–95 have Bottler's Contracts which predate the Consent Decrees. These are: Shreveport (1916), Dkt. 1, Exh. A; Texarkana (1916), Dkt. 1, Exh. D; Wichita (1921), Dkt. 1, Exh. I; Tulsa (1916), Dkt. 1, Exh. L; and Fort Smith (1916), Dkt. 1, Exh. R. The relevancy of any differences between these Bottler's Contracts and Bottler's Contracts executed after the 1921 Consent Decrees will be discussed *infra* at note 54.

**14.** Despite this pass-through, the amended bottlers pay more for Bottler's Syrup than the unamended bottlers due to the operation of the other pricing provisions of the 1978 Amendment. For example, during the first quarter of 1983, amended bottlers paid $3.049 per gallon for Bottler's Syrup while unamended bottlers paid $2.69 per gallon. However, amended bottlers receive advertising funds on a 50–50 sharing basis from the Company while the unamended bottlers receive no advertising support. This support can be in excess of $1.00 per gallon. Therefore, if an unamended bottler does significant advertising, the actual cost per gallon may be greater for an unamended bottler than an amended bottler.

allege that if the Company utilizes lower cost HFCS–55, they should be entitled to a pass-through of the realized savings. *See Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.,* —— F.R.D. ——, ——, No. 81–48, slip op. at 9 (D.Del. April 12, 1983).

The Company has introduced soft drink beverages other than Coke. For example, TAB, a low calorie cola sweetened with saccharin, was introduced in 1963. Other beverages include Sprite, Fanta, Mr. Pibb, Fresca and Ramblin' Root Beer. These beverages are not sold pursuant to the Bottler's Contracts for Coca-Cola Bottler's Syrup; rather the syrup and beverage base [15] are sold under a separate term contract between the Company and the bottler and are priced according to a Company schedule without regard to the market price of any sweetener.

### B. *Introducing diet Coke*

As noted, the Company introduced TAB in 1963. Since that time, TAB has become the largest selling diet soft drink. Lawrence R. Cowart, a senior vice president of the Company, testified that TAB's two leading diet cola competitors, Diet Pepsi and Pepsi Light, however, have a greater combined market share than TAB. Transcript of April 4, 1983 Hearing ("Tr.") at 35–36. In addition, the diet soft drink market currently constitutes approximately 20 percent of the total soft drink market, and some projections call for it to reach 30 to 40 percent by 1990. *Id.* at 40. In this, the most rapidly growing segment of the beverage market, competition is intense and the financial stakes are high. For example, a 10 percent growth in market share translates to retail revenues of approximately $5 billion. *Id.* at 36–37.

Given this growth potential, the Company reviewed its market offerings and determined that TAB, while a market leader, suffered from a relatively narrow market appeal.[16] In order to meet their anticipated market expansion, the Company developed a "three cola strategy" comprising Coke, TAB, and another diet cola with broader market appeal. *Id.* at 37. In 1980, the Company began a two-year market and technical research project aimed at developing the new diet cola. On July 8, 1982, diet Coke was introduced with great fanfare.[17] The name was chosen carefully and focused on the descriptive nature of the word "diet" and the tremendous market recognition of "Coke." *Id.* at 41. The advertising emphasized the taste of the new cola and its relationship to Coke, rather than its low-calorie nature.[18] The advertising campaign has been intense and effective. The Company spent some $50 million in research and marketing, has budgeted $31 million for 1983 advertising, and has expended approximately $20 million to date. *Id.* at 48. The response has been tremendous and diet Coke may surpass even TAB's market share.

The Company sold diet Coke syrup to bottlers at the same price as TAB syrup—$3.02 per gallon during the first quarter of 1983.[19] As noted, the price of Coke syrup to amended bottlers was $3.049 per gallon and $2.69 per gallon to the unamended bottlers during the same time period. The sweetening agent in diet Coke is saccharin which

---

**15.** Beverage base is comprised of the beverage flavoring and sweetener whereas syrup includes water.

**16.** The Company asserts that approximately 70% of TAB consumers are female. Generally, advertising of TAB has been directed towards this group. Significant growth potential exists in the male and affluent gay market—two consumer groups to which TAB does not appeal. *See* 15 Leisure Beverage Insider 2 (September 13, 1982) (attached to Affidavit of Jesse A. Finklestein, Dkt. 68).

**17.** "diet Coke" was introduced, not test marketed, in New York. *See* Dyson Exh. 58.

**18.** The jingle for the product proudly proclaims in part: "Introducing diet Coke. You're gonna drink it just for the taste of it."

**19.** The price of TAB and diet Coke beverage base was $2.97 per gallon in the first quarter of 1983. The difference in price is reflected by increased freight charges for syrup which includes water. Most bottlers purchase beverage base.

costs approximately $1.59 per gallon less than the granulated sugar/HFCS–55 mixture used in Coke syrup.[20] The bottlers want to benefit from this cost savings while the Company insists the higher profit margin is necessary to cover the large research, development, marketing, and advertising costs relating to diet Coke. All agree that the bottlers sell diet Coke at a profit even without the pass-through of savings; therefore, the dispute centers upon who should receive the incremental profit—the Company or the bottlers.

The situation is complicated by the manner in which diet Coke was introduced. The bottlers were not consulted before the introduction and no price terms were discussed. Cowart testified that this failure to consult the bottlers occurred because of competitive pressure. Tr. at 40. The Company's fear of the imminent introduction of Pepsico's caffeine free colas necessitated the accelerated introduction of the Company's new entrant in the cola market. In fact, these caffeine free colas, Pepsi-Free and Sugar-free Pepsi-Free, were introduced two days before diet Coke. *Id.* This series of events had several unfortunate effects from the bottler's viewpoint: first, the lavish advertising campaign precipitated immediate demand for a product to which the

bottlers did not have immediate access; second, this demand strengthened the negotiating position of the Company and weakened that of the bottlers regarding the marketing terms for diet Coke; and third, the failure to consult resulted in somewhat bruised egos.[21]

Naturally, bottlers began requesting, if not demanding, diet Coke syrup and beverage base. Many felt that the Company was obligated to provide diet Coke under the terms of their existing Bottler's Contracts for Coke, whether they be amended or unamended bottlers. The Company, however, took the position that diet Coke was not within the scope of the existing contracts and a new term contract with flexible pricing would have to be developed.

On October 7, 1982 the Company formally presented a proposed Phase I/Phase II negotiating procedure to the chairman of an Ad Hoc Committee[22] which was followed by a formal presentation to the Board of Governors of The Coca-Cola Bottlers' Association.[23] Phase I of the process constitutes the execution of a Temporary Amendment to the Bottler's Contract which governs the pricing of diet Coke pending a final agreement on a permanent contractual arrangement.[24] Phase II represents negotiations towards the permanent pricing and market-

---

**20.** According to the plaintiffs, this results in the Company's receiving an additional $1.59 in profit. They arrive at this calculation by the following means: saccharin has approximately 400 times the sweetening power of sugar; only approximately $.06 worth of saccharin is used in each gallon as opposed to approximately $1.65 worth of sugar in Bottler's Syrup. Dkt. 39, at 22 (Plaintiffs' Opening Brief).

**21.** *The ego factor should not be discounted.* Intrafamily squabbles are often particularly nasty and the relationship between the Company and the independent bottlers falls within this category. Conflict also is evident among factions of the bottlers, some of whom are owned by or financially indebted to the Company. While the Company and bottlers have a symbiotic relationship, the tensions are real and divisive.

**22.** The Ad Hoc Committee was appointed by the Coca-Cola Bottlers' Association, *see infra* note 23, to negotiate with the Company on contractual issues related to the pricing of diet Coke and the introduction of new soft drink

products such as those using other sweeteners or products without caffeine. The Ad Hoc Committee is composed of representatives of large, medium and small bottlers and includes: Charles P. Brightwell of Montgomery, Ala.; Harvey E. Anderson of Rochester, N.Y.; Fred M. Bellingrath of Pine Bluff, Ark.; W. Kenon Rand, Jr., of Durham, N.C.; Edwin C. Rice, Jr., of Springfield, Mo.; and Crawford Johnson, III, of Birmingham, Ala. Only Rice represents an unamended bottler. Dkt. 55, Exh. 5, ¶ 17 (Affidavit of John C. Reed).

**23.** The Coca-Cola Bottlers' Association is an association of all domestic bottlers of Company products. It is represented by a Board of Governors of which William Schmidt, president of plaintiff Elizabethtown, is a member. *Id.* ¶¶ 6, 12.

**24.** During the negotiation of Phase I the Company agreed to sell diet Coke under a permanent amendment to the perpetual contract rather than a term contract. *Id.* ¶ 9.

ing of diet Coke and other new cola beverages.[25] Phase II negotiations are in progress at this time.[26]

The Temporary Amendment is intended to be an interim measure which permits the sale of diet Coke pending permanent resolution of the Bottler's Contract issues. Approximately 191 first-line bottlers have signed the Temporary Amendment and approximately 181 first-line bottlers, while having not signed, have agreed to the terms of the Temporary Amendment.[27] These 372 first-line bottlers are receiving diet Coke syrup or beverage base and are marketing diet Coke within their exclusive territories. The plaintiffs in this case, who represent approximately 3 percent of the Company's domestic sales of Bottler's Syrup, could have access to diet Coke but have refused to either sign or accept the terms of the Temporary Amendment. Consequently, the Company has refused to provide diet Coke syrup or beverage base to these bottlers unless and until they either sign or accept the terms of the Temporary Amendment. Plaintiffs basically object to one clause of the Temporary Amendment which states:

> 9. It being the intent and purpose of the Bottler and the Company that this Temporary Amendment shall in no way prejudice or otherwise affect their respective rights and obligations under the Bottler's Contract or from any other source, or their respective legal or equitable

claims, the Bottler and the Company expressly stipulate that this Temporary Amendment shall have no such effect. It is possible that other bottlers may seek through judicial interpretation or otherwise to require the Company to supply Coca-Cola syrup or beverage base for diet Coca-Cola under their existing Bottler's Contracts at the price then in effect for Bottlers' Coca-Cola syrup absent this Temporary Amendment. It is further agreed, however, that during the period this Temporary Amendment is in effect, the price of Coca-Cola syrup and beverage base for diet Coca-Cola as between the parties hereto shall be determined solely under this Temporary Amendment. Dkt. 1, Exh. W, ¶ 9 of Temporary Amendment.[28] This clause erects an irrevocable waiver of the right to receive reimbursement of overcharges should this Court ultimately decide that the bottlers are entitled to diet Coke syrup or beverage base pursuant to their existing contracts or that the bottlers are entitled to any pass-through of savings from the utilization of saccharin.

This then sets the stage for the current controversy. The bottlers assert that they are faced with a Hobson's choice: accede to the demands of the Company and accept diet Coke pursuant to the Temporary Amendment thereby waiving any right to recover any overcharges during the time the Temporary Amendment is operative; or

25. Phase II would encompass sugar-free colas sweetened with aspartame—a new low calorie sweetener which is currently used in diet Coke marketed in Canada—and caffeine free versions of Coke, diet Coke, and TAB. *Id.* Aspartame is an artificial sweetener made from amino acids. The Food and Drug Administration ("FDA") has approved it for use in some products and it is marketed by the Searle Corp. under the trade names "Equal" and "nutrisweet." Unlike saccharin, the use of aspartame has no aftertaste and would not require a cancer-risk warning.

26. On January 17, 1983 the Ad Hoc Committee approved a business proposal which would form the basis of a Phase II permanent amendment. On January 18, 1983 this proposal was presented to the Board of Governors and was presented by satellite broadcast to the entire bottling system on January 20, 1983. Since the Board cannot take action which would bind

each bottler, individualized sessions with small groups of bottlers are ongoing to fine tune and revise the Phase II proposal.

27. There are two versions of the Temporary Amendment. The earlier, printed version was signed by approximately 187 bottlers and a later typed version was signed by four bottlers. Dkt. 55, Exh. 7, ¶ 25 (Affidavit of Charles L. Wallace). The Temporary Amendment, in either form, contains a "most-favored-nation" clause which allows the bottler to take advantage of more advantageous terms in subsequent versions of the Temporary Amendment. *Id.* Exh. A, ¶ 8 & B, ¶ 8.

28. The second sentence of this clause does not appear in the earlier printed version, *see id.* Exh. A, ¶ 9, and apparently only this form has been presented to the plaintiffs.

reject the terms of the Temporary Amendment and thereby lose the opportunity to market diet Coke, incur the wrath of frustrated customers, and risk potential loss of shelf-space and destruction of their businesses.[29]

## II. *The Relief Sought and the Applicable Standard*

The bottlers desire the Court to issue a preliminary injunction which would allow them to purchase diet Coke syrup without waiving their interim rights. In other words, the bottlers request that the Court reform paragraph nine of the Temporary Amendment to strike the irrevocable waiver. The bottlers seek this relief *pendente lite* and have offered to pay the current Temporary Amendment price for diet Coke syrup to the Company subject to refund should they prevail in this litigation.[30]

■ The parties do not dispute the relevant standard governing the grant of a preliminary injunction. In this Circuit, it is well established that this Court must consider four factors in the grant of preliminary injunctive relief: first, the moving party must show a reasonable probability of success in the litigation; second, the moving party must show that the failure to grant the relief will result in irreparable injury; third, the Court should consider, if relevant, the possibility of harm to other interested persons from the grant or denial; and fourth, the Court should consider the public interest. *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978); *Cities Services Co. v. Mesa Petroleum Co.,* 541 F.Supp. 1220, 1222 (D.Del.

1982). Upon consideration of the applicable factors, the Court will not grant the requested preliminary relief.

## III. *Probability of Success on the Merits*

■ In a discussion of the merits, the first question which the Court must address is the nature of the two products—Coke and diet Coke—for if no identity exists between them, the bottlers are not entitled to diet Coke under their Bottler's Contracts and the inquiry must stop. Only if the products share common attributes, in light of several indicia, can the Court turn to the specific questions of the rights of the two classes of bottlers under their Bottler's Contracts.

### A. *Is diet Coke the real thing?*

At the early stages of this litigation, the bottlers argued that diet Coke was simply Coke with saccharin as its sweetener. As such, the bottlers contended that they were entitled to diet Coke syrup under their existing Bottler's Contracts. This theory has evolved to encompass two positions: first, that diet Coke is simply a version of a product which has undergone evolutionary change but which retains its identity as Coke; and second, that any differences between Coke and diet Coke Bottler's Syrup are either insignificant or reflect attempts to achieve taste identity.

The aura of secretiveness surrounding the Coke formula has reached legendary status. Nonetheless, some of the ingredients have found their way into the public realm. For example, in 1916 the Supreme Court wrote:

> It [the syrup] was originally called 'Coca-Cola Syrup and Extract'. It is produced by melting sugar,—the analysis showing that 52.64 per cent. of the product is

**29.** In the high volume soft drink market, shelf space in supermarkets for the Company's product is extremely important. Loss of shelf space to the products of competitors presumably can result in loss of sales volume.

**30.** Plaintiffs suggested two other alternatives: first, to pay the Temporary Amendment price to the Company but deposit the amount of savings realized by the substitution of saccha-

rin into the Court's registry or any other escrow fund for dispersal upon conclusion of the litigation; and second, to pay the price established by their amended or unamended Bottler's Contracts but reflecting the savings realized by the substitution of saccharin subject to reimbursement to the Company should the Company prevail in this litigation.

sugar and 42.63 per cent. is water. Into the syrup thus formed by boiling the sugar, there are introduced coloring, flavoring, and other ingredients, in order to give the syrup a distinctive character. The caffeine, as has been said, is introduced in the second or third 'melting.'

*United States v. Coca Cola Co. of Atlanta,* 241 U.S. 265, 284, 36 S.Ct. 573, 579, 60 L.Ed. 995 (1916). Similarly, a Thomas pamphlet included in the record in the 1920 litigation in this Court states that:

> A bottle of Coca-Cola contains carbonated water and Coca-Cola Syrup. This syrup is composed of: Pure water, sterilized by boiling; Sugar, granulated, best quality; Flavoring Extracts and Carmel; Caffeine, the active principle of tea; Citric and Phosphoric acids.

> The sugar, the choice extracts of ripe fruits, the Carmel are blended to give Coca-Cola its color and inimitable flavor. The Citric Acid, derived from lemon, and the Phosphoric Acid combined with the carbonated water to produce the pleasant piquancy which affects the sweetness of the sugar. The refreshing caffeine of tea, freed from its unwholesome associate tannic acid, is employed in approximately one-half the quantity that is contained in a cup of tea or coffee.

Record in *The Coca-Cola Bottling Co. v. The Coca-Cola Co.,* No. 2651 (3d Cir.1921), Second Affidavit of George T. Hunter, Exh. 56, at 1341–43 [hereinafter cited as Rec.] (cited in Dkt. 63, ¶ 6, Second Affidavit of Emmet J. Bondurant).

Dr. Pemberton's formula changed over the years yet the product retained its identity as Coke. The parties have stipulated for purposes of this preliminary injunction proceeding that throughout its history the secret blend of flavor oils and ingredients—known as Merchandise 7X—has remained constant in composition and quantity. Nonetheless, many known alterations of the formula have occurred since the July 21, 1899 contract.[31]

For purposes of this litigation, the most important historical change was the inclusion and subsequent elimination of saccharin in 1907. Until 1907 the Company manufactured a single Coke syrup for use in bottling and fountains. According to Charles Howard Chandler, this syrup contained both sugar and saccharin. Rec. *supra,* page 15, at 1714. The Pure Food and Drug Act of 1906 prohibited the use of saccharin in food products and it was removed and replaced with a larger quantity of granulated sugar. This change resulted in an alteration in the taste of Coke.[32] The

---

**31.** These changes are as follows: (1) in 1900, the manufacturing process was changed to eliminate the $\frac{1}{400}\%$ of cocaine in Coke; (2) in 1903 a very slight change of an unknown nature was made; (3) in 1906, confectioners sugar was replaced by granulated sugar, (4) after passage in 1906 of the Pure Food and Drug Act which prohibited the use of saccharin, the saccharin in Bottler's Syrup was removed; (5) in 1906–07 the level of sugar was increased; (6) in 1906–07 the level of caffeine was reduced slightly; (7) in 1917, the level of caffeine was reduced from 1.19 to .62 grams per bottle; (8) during World War I, beet, invert and plantation sugars were used; (9) after 1921, the sugar was increased from 5.32 to 5.6534 lbs. per gallon; (10) during World War II, beet sugar was used in substantial quantities; (11) after World War II, there were small changes in the amounts of caffeine; (12) in 1974, caffeine was reduced from 3.15 to 2.36 grams per gallon; and (13) in 1980, the amount of granulated sugar was reduced from 5.6534 to 2.8267 lbs. per gallon and 2.9816 lbs. per gallon of HFCS–55 was introduced. *See* Dkt. 97, Exhibit A; *see also Coca-*

*Cola Co. v. Koke Co. of America,* 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189 (1920); Rec. *supra* page 15, at 1714 (Second Affidavit of Charles Howard Chandler); *Coca-Cola v. J.G. Butler & Sons,* 229 F. 224, 226–27 (8th Cir.1920).

**32.** In a contemporaneous letter, B.F. Thomas wrote:

> I note what you say about the syrup. While there may be a slight change in the syrup, I do not think it would amount to enough to account for the complaints you have been having, as most of the other bottlers seem to be free from complaints. If the complaints you are receiving are due to the slight change in the syrup, it is one of the best evidences I have ever had brought to my attention of the delicacy of the public taste. I have always thought there was something in this, and if the publuc [sic] will notice such a slight change in coca cola, how much easier is it for it to see the difference in the many rank imitations and substitutes put out for coca cola.

bottlers now argue that diet Coke is simply a resurrection of the pre-1907 version. This, of course, is incorrect because diet Coke contains no sugar and the pre-1907 version contained both sugar *and* saccharin.[33] The bottlers' position is weakened further in that at all times until the introduction of diet Coke, only one form of Bottler's Syrup bore the name Coca-Cola.[34] Now, however, two forms of Bottler's Syrup bear the name—Coca-Cola and diet Coca-Cola.

It is now undisputed that the chemical compositions of the two Bottler's Syrups differ. Other than Merchandise 7X, which, as the parties have stipulated for the purpose of this motion, is common to both syrups, the contents are as follows:

| Ingredient | Quantity per gallon of Coca-Cola Syrup | Quantity per gallon of diet Coca-Cola Syrup |
|---|---|---|
| Caramel | 91.99 g | 85.48 g |
| Water | 4.4927 lbs. | 8.0195 lbs. |
| Nutritive Sweetener [35] | | |
|    Sucrose | 2.8267 lbs. | 0 |
|    HFCS–55 | 2.9816 lbs. | 0 |
| Non-Nutritive Sweetener | | |
|    Saccharin | 0 | 8.944 g |
| Caffeine | 2.36 g | 3.15 g |
| Phosphoric Acid | 12.20 g | 5.96 g |
|    (Phosporous) | (4.170) g | (1.88) g |
| Citric Acid | 0 | 4.76 g |
| Extract of Cola nut | 2.18 g | 0 |
| Sodium Benzoate | 0 | 4.79 g |
| Sodium | .94 g | 2.29 g |
| Potassium | Trace | Trace |
| Vanilla Extract | 1.86 g | 1.13 g |

Dkt. 97, ¶ 4. Another difference is the pH factor, or measure of acidity, which is 3.0 for diet Coke and 2.5 for Coke. Dkt. 55 Exh. 1, ¶ 4 (Affidavit of Anton Amon).

> As you suggest, it is about time I was making a trip to Knoxville, and I will take advantage of the first opportunity I have to run up and spend the day with you. I think the Coca Cola plant here has had to make the quantity of coca cola put into each bottle, a little flush over what they had been doing before. The new syrup was supposed to contain and [sic] increased amount of sugar, equivalent to the sweetening power of the guarantos [saccharin] which had previously been used. It does not seem, however, that it is quite as sweet as they intended.

Letter from B.F. Thomas to J.R. Roddy, Esq., July 19, 1907 (attached as Exh. A to Second Affidavit of Emmet J. Bondurant, Dkt. 63).

**33.** The quantity of saccharin in the pre-1907 version is unknown.

**34.** Since 1907, however, the compositions of Coke Bottler's Syrup and fountain Coke syrup have differed. For example, fountain syrup contains less sugar, more caffeine and possibly less caramel and phosphoric acid. *See Coca-*

The parties diverge, however, over the significance of these differences. The Company's first expert, Dr. Walter G. Jennings,[36] performed gas chromatography [37]

*Cola Co. v. J.G. Butler & Sons*, 229 F. at 226; Dkt. 97, Exhibit A, ¶ 4.

**35.** The phrases nutritive sweetener and non-nutritive sweetener presumably refer, at least in part, to the nutritional value of the sweetening agent.

**36.** Dr. Jennings is a Professor in the Department of Food Science and Technology at the University of California, Davis. Dkt. 55, Exh. 3, ¶ 1.

**37.** Chromatography is a process of separating gases, liquids, or solids in a mixture or solution by absorption. As the mixture flows over the absorbent medium, often in a column, each substance finally appears in the medium at a different level or band that is often colored. Gas chromatography involves vaporizing a sample, passing it through a column filled with various materials which impede the flow of each compound at a recorded rate. Results are

tests on samples of Coke and diet Coke and concluded that they had different "flavor profiles."[38] Dkt. 55, Exh. B, ¶ 7. The bottlers present the affidavits of two experts who disagree with or distinguish the conclusions of Dr. Jennings and examine the effect of the chemical differences between diet Coke and Coke. Miles E. Hess[39] opines that all of the differences between diet Coke and Coke are attributable to attempts to mask the distinctive aftertaste of saccharin.[40] Dkt. 87, ¶ 3. Hess also states that different combinations of flavor oils and other ingredients may taste identical to the consumer and that the overall taste, rather than the method to achieve that taste, constitutes the only salient focal point of comparison. Id. at ¶ 11.[41] The affidavit of William R. Ellis, Jr.,[42] supports the opinion of Hess and focuses further on the question of intent and consumer perception. He notes that the addition of saccharin causes a substantial change in the taste of a soft drink and that the differences between diet Coke and Coca-Cola are intended to disguise this difference from the consumer. Id. at ¶ 5.

The Company counters these conclusions with the opinion of Dr. John J. Powers.[43] He concludes that the Company could have more effectively approximated the taste of Coca-Cola by using other ingredients in diet Coke. Specifically, he notes that, contrary to the Hess contentions, citric acid exacerbates the saccharin aftertaste and sodium benzoate introduces a biting or burning sensation. Furthermore, the Company alleges, consumers can distinguish between the two drinks when the saccharin in diet Coke is removed and replaced with the identical granulated sugar/HFCS–55 combination used in Coca-Cola. Dkt. 55, Exh. 6, ¶ 9 (Affidavit of Roy Stout).[44] Finally, the

recorded on a continuous chart which results in a "scale" showing when each compound exits the column, thus identifying the compound by the time it appears. The scale also indicates concentration of the compound by the height and area of the resulting peak.

**38.** Two samples of identical composition analyzed on a gas chromatograph under identical conditions will produce identical chromatograms. The peaks and valleys, and their size and width as represented by the gas chromatograph, constitute the flavor profile. Samples containing different organic compounds or different amounts of the same compound will produce different chromatographs. Dkt. 55, Exh. 3, ¶ 5. In this instance, Jennings removed the effects of saccharin, sugar, phosphoric acid, and citric acid to obtain flavor profiles independent from the sweetening ingredients.

**39.** Hess is a professional consultant to the soft drink industry and has a Bachelor of Science degree in chemistry and food technology from the University of Illinois. He also has over 40 years of experience in the soft drink industry. Dkt. 87, ¶ 1.

**40.** Specifically, Hess makes several points: first, citric acid more effectively masks the aftertaste than phosphoric acid, and it is therefore likely that the decrease of phosphoric acid and addition of citric acid to diet Coke was made for this reason; second, the addition of citric acid accounts for the elevated pH of diet Coke because citric acid is less acidic than phosphoric acid; third, since citric acid is less effective than phosphoric acid as a preservative, the addition of sodium benzoate to diet Coke was

necessary; fourth, extract of cola nut is a practically odorless ingredient utilized as a source of caffeine and since caffeine is available from other sources, the absence of the extract from diet Coke is unimportant. Dkt. 87, ¶¶ 4, 5, 6, 19.

**41.** This also explains the inability to discern the ingredients of a soft drink from chemical analysis. During processing, the flavors react with one another to form new compounds and chemical analysis cannot, through reverse engineering, deduce the process and ingredients. If the state of the art was such that an analysis was possible, the secret of Coca-Cola would be discoverable.

**42.** Ellis is a retired Company chemist. He holds a Bachelor of Science in Chemical Engineering from Texas A & M College and was involved in the manufacture, marketing, and quality control processes of the Company for approximately 40 years. Dkt. 86, ¶ 2.

**43.** Powers has a Ph.D. in Food Science from the University of Massachusetts and is the William Terrell Distinguished Professor of Science at the University of Georgia. Defendant's Exh. 3, ¶ 1. He has had no experience in the soft drink industry.

**44.** This contention, of course, is meritless if one accepts the Hess/Ellis contention that the goal is to make similar tasting end products. If the differences between the syrups are aimed at masking the saccharin taste, then substituting sugar/HFCS–55 for saccharin in diet Coke

Company argues that, as a matter of law, the products are different because the Food and Drug Administration ("FDA") has placed these products in separate product categories.[45]

Despite these acknowledged dissimilarities, there are several indicia of similarity which must be considered. To define a product solely by its chemical composition disregards other important definitional criteria. While it is undisputed that diet Coke differs chemically from Coke, a substantial question regarding taste identity remains. Furthermore, it is clear that the Company wished to sell and promote diet Coke by associating the product with Coke.[46] Both products utilize the patented and distinctive Coke bottle design and the "Coke" and "Coca-Cola" script logo. The labels of the two products are strikingly similar. The Company simply reversed the well-known white on red color scheme of Coke in labelling diet Coke. The message which resounds with klaxonian vigor from the packaging and advertisements is simply "this is Coke—but it's better for you and less fattening."[47] *See* Dkt. 33 (83–120), ¶ 12 (Third Affidavit of John Tiernan) (Company officials acknowledged that under the block approach of same name utilization, new products should have same taste as the parent product even if the ingredients need to be altered).

Given the Company's acknowledged goal of line extension of the Coke family of products, the blatant identification of diet Coke with Coke, and the commonality of the coveted Merchandise 7X to both products, the Court concludes that for at least some purposes diet Coke may be Coke and now turns to the question of the contractual definitions relevant to the claims of the amended and unamended bottlers.

### B. The Rights of the Unamended Bottlers

The unamended bottlers in Civil Action No. 83–95 claim that the Company must furnish diet Coke syrup to them pursuant to the terms of their Bottler's Contracts and the 1921 Consent Decrees.[48] This contention focuses on two primary areas: first, that diet Coke syrup is encompassed by the Bottler's Contracts and the 1921 Consent Decrees; and second, the failure to sell diet Coke syrup to the unamended bottlers violates their contractually granted trademark rights.

### 1. The Bottler's Contracts and the 1921 Consent Decrees

Pursuant to the 1921 Consent Decrees the Whitehead-Lupton first-line bottlers amended their Bottler's Contracts and the Thomas first-line bottlers executed new perpetual contracts. These were form contracts and were essentially identical. The

---

would necessarily taste different than Coke—just as it would differ from diet Coke.

**45.** Coca-Cola falls within the FDA classification of "soda water" pursuant to 21 C.F.R. § 165.175(a); *see* 21 U.S.C. § 341 (FDA may promulgate standards of identity which distinguish between various categories and products). Drinks with artificial sweeteners are specifically excluded from this class and fall within a different product category for "special dietary foods." 21 U.S.C. § 343(j); 21 C.F.R. § 105.3(a)(2).

**46.** In presenting the proposed Phase II amendment to bottlers, Company officials stressed the strength of the Coke name and the need to capitalize on the name through line extensions. Dkt. (83–120) 33, ¶¶ 4–8 (Third Affidavit of John Tiernan); *cf. id.* Exh. A, at 22 (statement of Allen McCusker, a Company vice president, that the inference from the advertising for caf-

feine free drinks will be that the drink delivers the same taste as the regular brand).

**47.** One empirical study suggests that in a blind taste test, consumers favored diet Coke over Diet Pepsi by a slim margin. When the test was done with consumers knowing the brand names, diet Coke was preferred by a significant margin. The same test yielded similar results when diet Coke was compared with TAB. This demonstrably suggests the strength of the "Coke" name—the very strength the Company hoped to utilize to launch this new market entrant. Dkt. 85, ¶ 6(c) (Fourth Affidavit of John C. Dunagan).

**48.** The Court expresses no opinion on the standing of the plaintiffs to assert rights under the Consent Decrees.

current standard form contract of unamended bottlers states:

> The Company hereby gives and conveys to BOTTLER the right to use the trademark COCA–COLA and COKE, and all labels and designs pertaining thereto, in connection with the product "Coca-Cola: in bottles in the territory hereinbefore described, and COMPANY agrees not to convey, assign or transfer in said territory to any other party whatsoever; and COMPANY agrees to furnish to BOTTLER, and only to furnish for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of BOTTLER in the territory herein described. Nothing herein, however, shall give BOTTLER any interest in the trademarks COCA-COLA and COKE, labels, etc., nor shall this contract in any way interfere with the use of said trademarks COCA-COLA and COKE, labels, etc., in connection with the fountain product of COMPANY, it being understood and agreed that the use herewith given shall be confined to the bottled product, the name, labels, etc., in connection with the fountain product having been reserved by COMPANY.

Dkt. 1, Exh. J (1961 Bottler's Contract between Company and Monahans Coca-Cola Bottling Co.).[49]

The product "bottled Coca-Cola" is not defined in the unamended Bottler's Contracts. The Company asserts that the only product contemplated is bottled Coca-Cola and excludes any other Company products. As set forth in the preceding section, such a blanket assertion is meaningless in the current context.

The 1921 Consent Decrees, however, shed light on the meaning of Bottler's Syrup with regard to the unamended bottlers.[50] Paragraph 10 states that:

> The [Company] contracts that the syrup sold and furnished by it to the [parent bottlers] is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain no less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

Dkt. 1, Exh. 5, ¶ 10. While the phrase "standard Bottlers Coca-Cola Syrup" is also undefined in the corpus of the 1921 Consent Decrees, it seems clear that the syrup must contain 5.32 pounds of sugar. Since diet Coke syrup contains absolutely no sugar, *a fortiori,* it is not likely to be encompassed by the contractual phrase Bottler's Coca-Cola Syrup as employed by the 1921 Consent Decree.[51] It is concluded the un-

---

**49.** Some differences between earlier standard form Bottler's Contracts and this current version are discussed *infra* with regard to the trademark claims.

**50.** This Court has already held that interpretation of the Bottler's Contracts may involve interpretation of the 1921 Consent Decrees as a threshold matter. *See Coca-Cola Bottling Co. of Elizabethtown v. The Coca-Cola Co.,* 98 F.R.D. 254, 262, 266–67.

**51.** Alternatively, the plaintiffs argue that the 1921 Consent Decree establishes the Company's profit margin on each gallon of syrup and that this margin must remain constant, thereby necessitating a pass-through of the savings realized by the substitution of saccharin. Dkt. 83, at 28. The bottlers base this contention on the operation of the pricing provisions of the Consent Decrees. The Decrees established a price ceiling of $1.175 per gallon for Bottler's Syrup. Since the average price of sugar was $.07 per pound at that time, the cost of the required 5.32 pounds of sugar was $.3724 per

gallon. According to the plaintiff this fixed the profit margin of the Company at $.8026 per gallon. *Id.* This argument disregards three important facts. First, the $.8026 does not represent profit because the plaintiffs fail to consider the cost of the other ingredients. Second, the escalation provision of the Consent Decrees provides that for every $.01 increase in the price of sugar, the Company may increase the price of Bottler's Syrup by $.06. Since the Company only incurs actual additional cost of $.0532 per gallon by such an increase (due to the quantity of sugar), the Company's profit margin actually increases by more than half a cent per gallon. Finally, the Consent Decree also established the profit margin of the parent bottlers at $.125 per gallon by establishing a ceiling price of $1.30 per gallon for the resale price of Bottler's Syrup. ($1.30–$1.175 = $.125). Since the Company acquired all of the parents and has assumed their rights, *see supra* pages 1125–1126, the Company is entitled to this $.125 profit margin.

amended bottlers have not demonstrated a probability of success on the merits insofar as the same is based upon the Bottler's Contracts and the 1921 Consent Decrees.

### 2. Trademark Rights[52]

Plaintiffs argue that even if diet Coke syrup is not Bottler's Syrup to which they are contractually entitled, the contracts grant them certain trademark rights which allow them to obtain, bottle, and sell *any* product in receptacles bearing the name Coke or Coca-Cola. An examination of the genesis, nature, and extent of any trademark rights is essential to understanding this claim.

The 1915 Amendment to the 1899 contract between the Company and Whitehead/Thomas specifically addressed the Company's grant of trademark rights to the parent bottlers. It provides in relevant portion:

> For and in consideration of the agreement to sell and agreement to purchase, [the Company] does hereby give and convey to [the parent bottlers] the right to use the trade-mark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product bottled Coca-Cola, in the territory heretofore obtained by [the parent bottlers] and agrees not to convey, assign, or transfer the right of usage of said name in said territory, to any other party whatsoever; and [the Company] further agrees to only manufacture syrup for bottling purposes

in sufficient quantities to meet the requirements of [the parent bottlers], and of Coca-Cola Bottling Company, and for the requirements of the territory not conveyed by [the Company] to either of said companies. Nothing herein, however, shall give to [the parent bottlers] any interest in the name Coca-Cola, labels, etc., except the right of usage in connection with bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name Coca-Cola, labels, etc., in connection with the fountain product of [the Company]; it being understood and agreed that the use herewith given shall be confined to the bottled product, the name, labels, etc., in connection with the fountain product to be used as [the Company] deems fit and advisable, in any and all territory. [The Company] does hereby select [the parent bottlers] as its sole and exclusive customer and licensee for the purposes of bottling Coca-Cola in the territory heretofore acquired by said [parent bottlers], and [the Company] agrees not to sell its fountain syrup to any one, when [the Company] knows that said syrup is to be used for bottling purposes.

Reprinted in 269 F. at 802.

As previously noted, the 1915 Amendment necessitated amendments of first-line Bottler's Contracts of both the Thomas and Whitehead-Lupton bottlers. The language was patterned after the above-quoted language of the 1915 Amendment.[53]

---

**52.** This section is equally applicable to the amended bottlers who share the same trademark rights, if any, under their identical contract terms.

**53.** The Whitehead-Lupton/first-line Bottler's Contract states:

> FIRST: That [the parent] hereby gives and conveys to [the bottler] the right that it received from THE COCA–COLA COMPANY, to use the trade-mark name COCA–COLA, and all labels and designs pertaining thereto, in connection with the product "Bottled Coca-Cola" in the territory heretofore obtained by [the bottler] from [the parent]; and [the parent] agrees not to convey, assign or transfer the right of usage of said name in said territory to any other party whatsoever; and [the parent] agrees to obtain and furnish to [the bottler], and only to obtain, for the

territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of [the bottler] in the territory now owned or controlled by [the bottler], provided [the parent] can obtain such syrup from The Coca-Cola Company. *Nothing herein, however,* shall give [the bottler] any interest in the name COCA–COLA, labels, etc., except *the right of usage in connection with Bottled* Coca-Cola, nor shall this contract in any way interfere with the use of said name COCA–COLA, labels, etc., in connection with the fountain product of THE COCA–COLA COMPANY, *it being understood and agreed* that the use herewith given shall be confined to the bottled product; the names, labels, etc., in connection with the fountain product having been reserved by THE COCA–COLA COMPANY.

The 1920 litigation and resultant 1921 Consent Decrees directly impacted upon the respective trademark rights of the Company, the parent bottlers (Whitehead-Lupton and Thomas), and the first-line bottlers. The basic issue in that case was whether the contracts between the Company and the parent bottlers were terminable at will. Judge Morris of this Court denied a motion by the Company to dismiss which was based on three arguments: first, that the contract was terminable at will; second, if the contract was perpetual, it was void; and third, even if the parent bottlers had any rights or title in the trademark, good will or business, those rights had been transferred to the first-line bottlers.[54] 269 F. at 804.

In an exhaustive opinion Judge Morris found that the Company retained legal title to the process and that it could transfer its rights in good will and consequently its

trademark. *Id.* at 805–06. Similarly, it could grant the parents a limited interest in the trademark by way of a license and Judge Morris concluded that it was immaterial whether the interest in the trademark was a legal title or merely a beneficial interest because,

> I am unable to find any sound principle upon which to base a conclusion that the right so conveyed was other than an absolute and unlimited right of user in the complainant to the exclusion of all others, including the Georgia corporation, its successors and assigns, in the territory in question.

*Id.* at 811.

The 1921 Consent Decrees also addressed the question of trademark rights. Paragraph 8 states that any rights of the parent bottlers in the trademark are expressly transferred to the Company.[55] Pursuant to

---

Dkt. 63, Exh. G (Second Affidavit of Emmet J. Bondurant).

The Thomas/first-line Bottler's Contract states:

> FIRST: That [the parent] hereby assigns to [the bottler] the right that it received from THE COCA–COLA COMPANY, to use the trade-mark name COCA–COLA, and all labels and designs pertaining thereto, in connection with the product "Bottled Coca-Cola" in the territory hereinbefore described, and [the parent] agrees not to convey, assign or transfer the right of usage of said name in said territory to any other party whatsoever; and [the parent] agrees to obtain and furnish to [the bottler], and only to obtain, for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of [the bottler] in the territory herein described, provided [the parent] can obtain such syrup from THE COCA–COLA COMPANY. *Nothing herein, however,* shall give [the bottler] any interest in the name COCA–COLA, labels, etc., except the right of usage in connection with Bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name COCA–COLA, labels, etc., in connection with the fountain product of THE COCA–COLA COMPANY, *it being understood and agreed* that the use herewith given shall be confined to the bottled product, the names, labels, etc., in connection with the fountain product having been reserved by THE COCA–COLA COMPANY. Dkt. 63, Exh. H (Second Affidavit of Emmet J. Bondurant).

54. The bottlers listed in note 13 *supra* who executed Bottler's Contracts prior to the Con-

sent Decree are in this group. Since the Bottler's Contract language is substantially identical in the pre-1921 and post-1921 versions of the Bottler's Contracts, the ensuing analysis is equally applicable. One possible distinction, however, remains. Those parent bottlers with Bottler's Contracts executed before 1921 might be in a different position. As more fully explained *infra,* pages 1137–1139, the 1921 Consent Decrees encompassed a reacquisition of trademark rights by the Company and subsequent reconveyances of these rights to the parents. The Bottler's Contracts executed between 1916 and 1921, however, used the same language regarding trademarks and trade names as that construed by Judge Morris to constitute a property interest. Consequently, the plaintiffs argue that in 1921 the parent had nothing to convey to the Company, having already relinquished all trademark rights to first-line bottlers with contracts prior to 1921. Therefore, these bottlers retain this property right. As explained later, this is a distinction without a difference because, at most, the bottler's have only a property right within their exclusive territories.

55. Paragraph 8 reads:

> 8: Whatever title, right or ownership, if any, [the parent bottler] may have heretofore acquired, either under existing contracts between it and [the Company], or by virtue of its using and vending thereof in the trademark, trade-name, labels, designs and patented designed bottles, as to bottled Coca-Cola, said [parent bottler] does hereby transfer and assign to [the Company]; but it is agreed

another provision, Paragraph 9, the bottlers recognized that the Company had legal title to the trademarks as well as the beneficial use of those marks in the fountain side of the business. Paragraph 8 goes on to grant to the parent bottlers "the sole and exclusive right and license to use and vend on bottled Coca-Cola" the trademark, trade name, and patented bottle within their exclusive territory, "coupled with an interest in said right to use and vend, which right and license is perpetual and irrevocable." *See supra* note 55.

After the execution of the 1921 Consent Decrees, the Whitehead bottlers amended their contracts and the Thomas bottlers executed new contracts. These contracts repeated, verbatim, the relevant language utilized between 1915 and 1920.[56] *Compare* Dkt. 63, Exh. J, Cl. FIRST, K, Cl. FIRST (Second Affidavit of Emmet J. Bondurant) *with* note 53 *supra*. As the plaintiffs correctly note, this language is identical to that construed by Judge Morris and, having the benefit of his opinion, no prudent contract draftsman would utilize the same language if a different meaning were intended. As such, plaintiffs contend, the Compa-

ny acquiesced and accepted the interpretation of Judge Morris.

This Court need not determine the correctness of the plaintiffs' position. The parties admit that Judge Morris's opinion has neither res judicata nor collateral estoppel effect. At most, it would be given stare decisis effect. Nor should the Court address the various technical arguments raised by the parties with regard to trademark licensing and ownership pursuant to the Lanham Act. 15 U.S.C. §§ 1051 *et seq.* Instead, the Court need only look to the maximum aggregate of rights that the plaintiffs may possess. Viewed in this light, the plaintiffs possess the sole and exclusive right to use the trademark, trade name and bottle in their exclusive territories. This right has not been abrogated by the Company. While it is true that some spillover advertising of diet Coke from territories that are offering it has occurred,[57] with only limited exceptions,[58] these ads have not emanated from one of the plaintiffs exclusive territories. Similarly, the Company has not granted another entity the ability to sell diet Coke (or Coke for that matter) within the exclusive territories of these plaintiffs. In fact, the Company

that [the Company] hereby grants to [the parent bottler], the sole and exclusive right and license to use and vend on bottled Coca-Cola the trade-mark, trade-name Coca-Cola and other Coca-Cola labels and designs, and to use the patented designed Coca-Cola bottles in the territory described in their contracts, subject only to forfeiture in any territory that may be forfeited under the provisions of the contract as amended; coupled with an interest in said right to use and vend, which right and license is perpetual and irrevocable either by The Coca-Cola Company or its successors and assigns, or by any proceedings in insolvency of any character whatsoever, or by any trustee or receiver that may be appointed under insolvency or other proceedings against The Coca-Cola Company; and neither said The Coca-Cola Company nor its successors, assigns, receivers or trustees, nor purchaser from such receiver or trustee, shall have the right to use or vend said trademark, trade-name, labels, designs and patented designed bottles on or in connection with bottled Coca-Cola within such territory, nor to permit or license anyone else to do so without the consent of Coca-Cola Bottling Company.

**56.** The contract language quoted at pages 1134–35 *supra* was developed in 1955. It omits the phrase "except the right of usage in connection with Bottled Coca-Cola" and the "Nothing herein" clause. At this juncture, and for this purpose, the Court does not consider these omissions important.

**57.** It is virtually impossible to stop spillover advertisement because media territories do not conform to the bottlers' territories. Nonetheless, Company guidelines prohibit advertising from originating in a territory where the product is not available. Dkt. 55, Exh. 4, ¶ 10 (Affidavit of Bruce Kirkman).

**58.** One television advertisement for diet Coke originated in Bristol, Virginia, a territory served by a bottler who has neither signed nor accepted the Temporary Amendment and therefore cannot offer diet Coke. This advertisement occurred without the Company's consent and in contravention of its policies. The Company reprimanded the responsible bottler and advertising agency. *Id.*

conceded at oral argument that it would not do so. Tr. 226–28. Plaintiffs allege that some transshipment[59] of diet Coke has occurred into their territories;[60] however, plaintiffs have not demonstrated that such occurrences are pervasive. Furthermore, the Company has a policy against transshipment which provides for fines of bottlers who violate the exclusive territories of others. See Dkt. 55, Exhibit 7, ¶¶ 30–39 (Affidavit of Charles L. Wallace).[61]

The unamended Bottler's Contracts obligate the Company to provide Bottler's Syrup to the bottlers in amounts sufficient to meet demand. This, however, does not create a concomitant duty to provide diet Coke syrup. As stated earlier, at least with regards to the unamended bottlers, it appears the Bottler's Contracts do not obligate the Company to supply diet Coke syrup. Plaintiffs' argument that they are entitled to any product bearing the name "Coke" or "Coca-Cola," regardless of its association with a prefix such as "diet," cannot prevail in this context.[62] It is concluded the amended and unamended bottlers have not demonstrated a probability of success on the merits based upon asserted trademark rights.

In summary, the unamended bottlers have failed to demonstrate a likelihood of success on the merits. The Court now turns to a consideration of the amended bottlers.

## C. The Rights of the Amended Bottlers

The trademark rights enjoyed by the amended bottlers[63] are coextensive with those of the unamended bottlers.[64] As such, the Court must look elsewhere to determine if the unamended bottlers are entitled to diet Coke syrup under their Bottler's Contracts.

The 1978 Amendment provided for flexible pricing of Bottler's Syrup and states:

In the event that the formula for Bottle Syrup is modified, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of the market price of any such sweetening ingredient. The Sugar Element would continue to fluctuate in the manner described above for sugar.

Dkt. 1 (83–120), Exh. A–4, ¶ 1(c).

Under the express terms of this clause, the parties contemplated the replacement of granulated sugar in Bottler's Syrup with "another sweetening ingredient." The relevant inquiry is whether that phrase includes saccharin.

The Company argues that the clause does not apply because diet Coke is a new and different product and is not modified Coca-Cola. At oral argument, the Company asserted that the 1978 Amendment was never

---

**59.** Transshipment occurs when either a bottler of diet Coke or a purchaser within an area served by such a bottler sells or transfers diet Coke to customers within the territory of another bottler.

**60.** See Dkt. 83, App. Table 17 (references to affidavits supplied by plaintiffs regarding transshipment).

**61.** Policing of exclusive territories is a difficult task particularly when the customer does the transshipment. In such a case the bottler asserts it could sue its customer—a very unpalatable but nonetheless available remedy.

**62.** Had the Company sought to sell diet Coke either itself or through other bottlers within the plaintiffs' exclusive territories, the situation may be much different. See Buckley & Scott Utilities, Inc. v. Petroleum Heat & Power Co., 313 Mass. 498, 48 N.E.2d 154 (Mass.1943); Pa-

rev Products Co. v. I. Rokeach & Sons, 124 F.2d 147 (2d Cir.1941). Similarly, plaintiffs' protestations regarding "cannibalization" by diet Coke of Coke are irrelevant because diet Coke is not offered within their territories. Plaintiffs argue that the spillover advertising constitutes an "offer" of diet Coke. Since these advertisements are directed toward the territory of the bottler who bottles diet Coke rather than the territory of the plaintiffs, this tangential effect does not constitute an "offer."

**63.** The two plaintiffs in Civil Action 83–120, Alexandria Coca-Cola Bottling Co., Ltd. and Coca-Cola Bottling Co. of Presque Isle, Maine, are amended bottlers. See supra note 1.

**64.** The 1978 Amendment did not alter the trademark rights of the parties.

considered to apply to a non-nutritive sweetener. Tr. 220.[65] The parties have submitted a substantial amount of interpretative information regarding the 1978 Amendment.[66] Those documents fail to support the Company's contention. There is neither a distinction between nutritive and non-nutritive sweeteners nor a requirement of sugar. Rather, the documents generated by the Company to explain the 1978 Amendment and persuade the bottlers to amend their Bottler's Contracts utilize terms such as "new sweetening ingredient," "New sweeteners," "Future non-sucrose sweeteners," and "substitute sweetener." Dkt. 44, Exh. A–G (Second Affidavit of Emmet J. Bondurant).

On the record presently before the Court it appears that saccharin comes within the phrase "another sweetening ingredient" in the amended Bottler's Contracts. When this fact is combined with the common elements between diet Coke and Coke, particularly Merchandise 7X, and the utilization of the trade name, it appears likely that the amended bottlers will establish that diet Coke syrup is a modified version of Bottler's Syrup within the terms of their contract. It is held the amended bottlers have made the requisite showing of probability of success on the merits.

## IV.  *Irreparable Harm*

Even with the amended bottlers' showing of probability of success on the merits and assuming that the unamended bottlers could have made such a showing, they nonetheless are not entitled to preliminary injunctive relief. A Court may not grant a preliminary injunction without a showing of irreparable harm. *See supra* page 1130.

The bottlers allege several types of harm: first, lost sales of diet Coke; second, cannibalization of their Coke sales volume; third, transshipment by other bottlers or customers of diet Coke; and fourth, loss of their customers' good will. They attempt to transmogrify these elements into the impending destruction of their businesses.

As previously noted, cannibalization is irrelevant because diet Coke is not being offered in these bottlers' territories. *See supra* note 62. While it is certainly true that TAB and Coke are losing some sales to

---

**65.**  The following colloquy between the Company's counsel and the Court:

> THE COURT: The 1978 agreement provides for a sweetener other than sugar, doesn't it?
> MR. JONES: Your Honor, I think the evidence in the record to the extent it shows anything at all in this case shows that the amendment was never considered to apply to a non-nutritive sweetener.
> THE COURT: The language is not limited to non-nutritive sweetener, is it?
> MR. JONES: Your Honor, the language is limited to Coca-Cola bottled syrup. Coca-Cola bottled syrup has always included sugar, historically, that is undisputed in the case. That being the case, I think the only conclusion that can be drawn is that it does not apply to a non-nutritive sweetener, a non-sugar sweetener, if you will.
> THE COURT: It does say any sweetener, does it not?
> MR. JONES: Let me get the exact language. It speaks of an alternative sweetener in whole or in part.
> THE COURT: With no limitation?
> MR. JONES: That is correct.

Tr. 200. Mr. Jones went on to state that the sweetener must be "satisfactory" in order to come within the terms of the clause and that saccharin could not be considered satisfactory due to its taste. Despite Mr. Jones' representation the term "satisfactory" is absent from the face of the document. *See* Dkt. 1 (83–120), Exh. A–4. The term does appear in Company literature about the 1978 Amendment. *See* Dkt. 63, Exh. A, at GV0133 (Second Affidavit of Emmet J. Bondurant).

A question left for another day is whether aspartame—the sweetener used in diet Coke marketed in Canada and which is expected to soon be available for use in domestic soft-drinks—is either "nutritive" or "satisfactory" and therefore clearly within the terms of the 1978 Amendment under even the Company's interpretation.

**66.**  At this juncture the Court will assume, without deciding, that the use of such information poses no parol evidence problems under the laws of whichever states are applicable in interpreting the amended Bottler's Contracts. The extent that such information may be utilized in a final adjudication must await further briefing on choice of law principles and the applicable parol evidence rules.

diet Coke where diet Coke is available,[67] this does not result in irreparable injury to plaintiffs who do not bottle diet Coke.

In addition, virtually every harm the bottlers have articulated would be eliminated by signing the Temporary Amendment. The transshipment problem would end, customer good will restored, and any imminent harm to their businesses forestalled. Having signed the Temporary Amendment, the only real issue of irreparable harm emerges. Does the irrevocable waiver of the right to recover interim damages during the period of operating under the Temporary Amendment constitute irreparable harm if this Court ultimately decides that plaintiffs are entitled to either diet Coke under their Bottler's Contracts or a pass-through of the savings realized by the substitution of saccharin? In short, does the irrevocable loss of monetary damages justify the grant of a preliminary injunction?

The United States Court of Appeals for the Third Circuit specifically addressed the question in the following passage:

> Without intending to disparage the importance of such an injury, we observe that all that is lost is profits. Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction. Rather, in cases like these, courts ought to harken to the basic principle of equity that the threatened injury must be, in some way 'peculiar.' These are not 'small' corporations; there is no contention that compliance ... would render any appellee unable to meet its debts as they come due. Nor is there any

contention that the cost of compliance would be so great *vis-a-vis* the corporate budget that significant changes in a company's operations would be necessitated. Nor is this a case where compliance would permanently injure the corporation's reputation, or its goodwill.

*A.O. Smith Corp. v. Federal Trade Commission,* 530 F.2d 515, 527–28 (3d Cir.1976). While this result might appear harsh it is important to note that the court did not hold that lost profits would never justify the grant of preliminary injunctive relief. Instead, the irrevocable loss must be special, peculiar or work an onerous hardship. *See Gulf Oil Corp. v. Department of Energy,* 514 F.Supp. 1019, 1027 (D.D.C.1981) (when only monetary loss involved, the loss must be extremely serious so as to threaten existence of plaintiff); *Northern Natural Gas v. Department of Energy,* 464 F.Supp. 1145, 1158 (D.Del.1979) (lost profits sufficiently significant to be characterized as peculiar thus constituting irreparable harm).

In the current case there has been no showing of peculiar loss. If the bottlers sign the Temporary Amendment with its waiver intact, they will not lose money.[68] Quite the contrary, their overall profitability should increase but not as much as plaintiffs would prefer. Such a situation where only *additional* profits are irretrievably lost cannot constitute irreparable harm under the applicable standards. In any event, there has been no showing of particularized individual harm. It is concluded the plaintiffs have failed to demonstrate the existence of irreparable injury.

## V. Additional Factors

Having concluded neither the amended nor unamended bottlers sustained irrepara-

---

67. Initial projections called for substantial cannibalization of Company products by diet Coke. Cannibalization of TAB and Coke was expected to be approximately 49 percent. Dkt. 85, ¶ 6(g) (Fourth Affidavit of John C. Dunagan). In actuality, cannibalization has been estimated as 30 percent of diet Coke volume coming from TAB, very little coming from Coke, and the remaining sales coming from other competitors and new consumers. Dkt. 55, Exh. 6, ¶ 10 (Affidavit of Roy Stout).

68. In addition, it remains unclear that, should the bottlers sign the Temporary Amendment, they would incur any monetary loss. The Company provides large shared advertising supplements to bottler's receiving diet Coke. Such supplements might entirely offset the difference between the price of diet Coke under the Temporary Amendment and under the Bottler's Contract, assuming the bottlers desire to participate in the advertising campaign.

ble injury, it is not necessary to consider the two other factors considered on a motion for a preliminary injunction—harm to third parties by the grant or denial of the injunction, and the public interest.[69]

VI. *Conclusion*

The bottlers analogize their predicament to one of extortion. In reality it represents negotiating power. The unamended bottlers will not be destroyed if they sign the Temporary Amendment. All they risk is the loss of additional interim profits based upon ephemeral contract rights. The amended bottlers, whose rights are more solidified, are still faced with the task of ultimately prevailing. In either case, neither has demonstrated irreparable harm even if they fail to execute the Temporary Amendment. The grant of a preliminary injunction in such a context would be inappropriate.

An appropriate order will issue.

---

**69.** It should be noted, however, that the denial of the preliminary injunction does not end this matter. The Company conceded at oral argument that the execution of the Temporary Amendment would not prevent the litigants or other third parties from pursuing this litigation. Tr. 206–07.