**ALEXANDRIA COCA-COLA BOTTLING COMPANY, LTD., et al., Plaintiffs,**

v.

**The COCA-COLA COMPANY, Defendant.**

**Civ. A. No. 83–120.**

United States District Court, D. Delaware.

Aug. 14, 1984.

Edmund N. Carpenter, II, Charles F. Richards, Jr. and Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant, H. Lamar Mixson, Thomas B. Metzloff, Deborah J. Merritt and Jane F. Vehko, Bondurant, Miller, Hishon & Stephenson, Atlanta, Ga., Miles J. Alexander and Jerre B. Swan, Kilpatrick & Cody, Atlanta, Ga., F.A. Little, Jr., Gold, Little, Simon, Weems & Bruser, Alexandria, La., of counsel), for plaintiffs.

Andrew B. Kirkpatrick, Jr., William O. LaMotte and Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Frank C. Jones, Michael C. Russ and George S. Branch, King & Spalding, Atlanta, Ga., Jerome Gilson, Willian Brinks Olds Hofer Gilson & Lione Ltd., Chicago, Ill., of counsel), for defendant.

MURRAY M. SCHWARTZ, Chief Judge.

This civil action involves a dispute over the sale of the popular soft-drink "diet Coke." The plaintiffs, Alexandria Coca-Cola Bottling, Ltd. and Coca-Cola Bottling of Presque Isle, Maine,[1] seek declaratory, injunctive, and monetary relief against the Coca-Cola Company ("the Company") for an alleged breach of contract, violation of two 1921 Consent Decrees,[2] trademark in-

---

1. Four bottling companies have intervened as plaintiffs in this action: Rock Springs-Casper Coca-Cola Bottling, Inc.; Northern Neck Coca-Cola Bottling Co., Inc.; Martin Beverage Co., Inc.; and Coca-Cola Bottling Co. of Sante Fe, Inc.

2. *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, Nos. 388 & 389 (D.Del. October 4, 1921) ("1921

fringement, dilution of trademark value, and federal antitrust violations.[3] Pending before the Court is plaintiffs' motion for summary judgment on their contract claim. Plaintiffs' contend that the Company must supply diet Coke under the terms of contracts, amended in 1978, which govern the sale of "Coca-Cola Bottle Syrup."

## I. *Background*

The history and development of the Coca-Cola family was examined at length in the Court's recent opinion denying plaintiffs' motion for a preliminary injunction. *Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company,* 563 F.Supp. 1122 (D.Del.1983). Those background facts will not be repeated. A brief examination of plaintiffs' particular contractual relationship with the Coca-Cola Company is, however, warranted.[4]

### A. *The Coca-Cola Family*

In 1886, an Atlanta pharmacist, Dr. J.S. Pemberton, created the syrup for a soda fountain beverage and named it Coca-Cola.[5] In 1887, the name was registered as a trademark in the United States Patent Office. In exchange for $2,300, Asa Chandler acquired the Coca-Cola trademark and formula and in 1892 formed The Coca-Cola Company as a Georgia corporation.

Prior to 1899, Coca-Cola was sold as a fountain drink but in that year the Company entered into a contract[6] with two Chattanooga, Tennessee, lawyers, B.F. Thomas

and J.B. Whitehead, granting them the exclusive right to purchase Coca-Cola syrup at a fixed price, use the Coca-Cola trademarks, and sell Coca-Cola throughout the United States in bottles or other containers.[7] The Company retained the right to manufacture and sell syrup and to market fountain Coca-Cola.

In December 1899, Whitehead and Thomas formed a Tennessee corporation known as the Coca-Cola Bottling Company. Bottling plants were established in Chattanooga and Atlanta. The following year, because of a disagreement over the best method to develop the bottling business, the Coca-Cola Bottling Company divided its territory into two parts. Thomas retained ownership of the Coca-Cola Bottling Company and conveyed to Whitehead and his new business associate, J.T. Lupton, all of the rights that the Coca-Cola Bottling Company had under the 1899 contract to certain states in the newly divided territory. Whitehead and Lupton formed a Tennessee corporation originally named Dixie Coca-Cola Bottling Company, which later changed its name to The Coca-Cola Bottling Company.[8]

### 1. *Alexandria Coca-Cola Bottling Company, Ltd.*

Plaintiff Alexandria joined the Coca-Cola family in 1910 and signed a "First-Line Bottler's Contract" with the Whitehead-Lupton Company.[9] Alexandria's 1910 con-

---

Consent Decrees" or "Consent Decrees").

3. Jurisdiction is based on 28 U.S.C. sections 1332, 1338, 2201 (1982); 15 U.S.C. sections 15, 26, 1114, 1121, 1125 (1982).

4. Some of the early history is taken from *Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Company,* 563 F.Supp. 1122 (D.Del. 1983) (hereinafter "preliminary injunction opinion").

5. Throughout this opinion the names "Coca-Cola" and "Coke" will be used interchangeably.

6. *See* Dkt. 1, Exh. B–1 (Complaint).

7. The contract did not include the six New England states, Texas, and Mississippi. These states were excluded from the 1899 agreement be-

cause the Company previously granted exclusive rights in those states to other entities.

8. In an effort to avoid confusion, the Coca-Cola Bottling Company will be referred to as "Whitehead-Lupton."

9. Thomas' and Whitehead-Lupton's companies, along with two other entities, became known as "parent bottlers." They did not actually bottle Coca-Cola but instead contracted with other entities to bottle and sell Coca-Cola in exclusive geographic territories. Those bottlers were called "actual" or "first-line" bottlers. *See Coca-Cola Bottling Company of Shreveport, Inc. v. The Coca-Cola Bottling Company,* 563 F.Supp. at 1125.

tract provided that (1) Whitehead-Lupton would "lease and set over" the exclusive right to bottle Coca-Cola and to use the trademark; (2) the product to be sold by Alexandria was described as "a mixture of Coca-Cola Syrup and of water charged with carbonic acid gas ... to be [mixed] in proportion of not less than one ounce of Coca-Cola Syrup to eight ounces of water ..."; (3) Alexandria agreed not to use any substitute for or imitation of Coca-Cola; and (4) Whitehead-Lupton agreed "to properly and vigorously push the sale of bottled Coca-Cola." [10]

In 1915 the Company and parent bottlers modified their 1899 contract, primarily in response to changes in the Clayton Act. Subsequently, Whitehead-Lupton amended its contracts with Alexandria and other first-line bottlers through standardized printed contracts ("Bottler's Contract"). [11] Although the 1915 contract did not change the substance of the relationship between Whitehead-Lupton and Alexandria, the amended contract is significant for it marked the first use of the phrases "Bottled Coca-Cola" and "Bottlers' Coca-Cola in syrup form." [12] As explained *infra* at 1228, this new terminology reflected the Company's development of a syrup for use only in bottled Coca-Cola.

The first major contract dispute arose in 1919, when the Company sought to enter new contracts with the parent bottlers to reflect the high cost of sugar. The litigation generated by that dispute was detailed in the Court's preliminary injunction opinion and will not be repeated here. For present purposes it is sufficient to note that the parents and the Company entered into Consent Decrees in 1921, which amended the 1899 Contracts, as amended in 1915. *See Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796, 816 (D.Del. 1920). The Consent Decrees provided, *inter alia:* first, that the parents' contracts with the Company were perpetual; second, that the syrup sold and furnished by the Company was to be "high grade standard Bottler's Coca-Cola Syrup"; third, that such syrup contain no less than 5.32 pounds of sugar per gallon; fourth, that the cost of Bottler's Syrup to the parents would be no less than $1.17-½ per gallon and that the first-line bottlers would pay a maximum of $1.30 per gallon; fifth, that the price of Bottler's Syrup could increase based upon the increase in the market price of sugar as quoted quarterly by the ten largest refineries in the United States; and sixth, that the parents would have the exclusive right to use the trade name and trademark Coca-Cola in their exclusive territories.

The settlement with Whitehead-Lupton was temporarily conditioned on Whitehead-Lupton's ability to obtain acceptance of the modification of its first-line Bottler's Contracts to conform with the Consent Decrees. Alexandria's Bottler's Contract was amended to incorporate the terms of the 1921 Consent Decrees. [13]

### 2. *Coca-Cola Bottling Company of Presque Isle, Maine*

Plaintiff Presque Isle first joined the Coca-Cola family in 1952, when it executed a Bottler's Contract with the New England Bottling Company. [14] Presque Isle's contract gave it the exclusive right to use the

---

**10.** The 1910 Contract is reproduced in full at Dkt. 1, Exh. A.

**11.** Alexandria's amended contract is reproduced at Dkt. 1, Exh. A–2.

**12.** The 1915 amendment to the 1899 Contract between the Company and Whitehead/Thomas also was the first instance in which the phrase "Bottler's Syrup" was used. Dkt. 1, Exh. B–4.

**13.** *See* Dkt. 1, Exh. A–3.

**14.** The right to sell Coca-Cola in the New England territory initially was sold to the Seth

Fowle Partnership. In 1916, after Fowle's contract expired, the Company entered into a contract with Monore Bickart. Bickart, in turn, assigned his rights to the New England Bottling Company. However, after the New England Company was acquired by defendant in 1923, the New England contract was modified to parallel the price terms of the other parent bottlers. *See* Dkt. 121, ¶ 3 (Affidavit of John A. Blanchard). New England was not a party to the 1921 litigation.

Coca-Cola trademark in its territory; described the product to be covered by the contract as "Bottler's Syrup Coca-Cola"; and obligated it "not to manufacture .. [or sell] any product that is a substitute for or an imitation of Coca-Cola."

Between 1923 and 1975, the Company acquired and dissolved all of the parent and sub-parent bottlers. The Company, therefore, has succeeded to the rights and obligations of all the parent bottlers, and today sales of Bottler's Syrup are made directly from the Company to the actual bottlers.

### B. *The 1978 Amendment: Changes in Pricing Coca-Cola Syrup*

The seeds of the instant litigation were sown in 1977. In that year inflationary pressures combined with declining sales and profit margins and made it necessary for the Company to seek relief from the fixed price term in the Bottler Contracts.[15] The Company's initial proposal was for an unlimited flexible pricing formula.[16] When the plan was circulated in early 1978, however, it was met with stiff resistance.[17] Company officials[18] subsequently organized small regional meetings and invited selected bottlers to Atlanta to negotiate a more acceptable contract amendment and to discuss mutual business concerns.[19]

During these negotiations it was agreed that in exchange for price relief the bottlers would receive concessions from the Company. Some bottlers inquired about the possible use of less expensive sweeteners, such as the new generation of high fructose corn syrups being developed by the Company,[20] and proposed a clause which would require the Company to pass-on any cost-savings if a lower cost sweetener was substituted for sugar.[21] This concept was included in the final version of the 1978 Amendment[22] and induced many bottlers to go along with the new pricing formula.[23]

---

**15.** *See* Dkt. 121, ¶ 6 (Affidavit of John A. Blanchard).

**16.** Dkt. 52, Exh. D. at 105–06 (Third Affidavit of Emmet J. Bondurant).

**17.** The Company held meetings in late 1977 and early 1978 to get an initial impression from certain bottlers about a new, flexible price amendment. The president of plaintiff Presque Isle, John Tiernan, along with other bottlers met with officials in Atlanta on March 21, 1978 to discuss the Company's initial proposal. These individuals formed the "Original Bottler Discussion Group." *See* Dkt. 121, Exh. D (Affidavit of John A. Blanchard).

**18.** These officials included J. Lucian Smith, then president of the Company; Brian Dyson, president of Coca-Cola USA, a division of the Coca-Cola Company; Donald Keough, a former senior vice president of Coca-Cola, USA; Larry Cowart, then executive vice president of Coca-Cola USA; and John A. Blanchard, a former vice president and manager of the contractual department for Coca-Cola USA.

**19.** The actual drafting apparently occurred in conjunction with the Original Bottler Discussion Group and later the "Additional Bottler Discussion Group," which included those bottlers who made significant recommendations at the regional meetings. *Id.* at Exh. K.

**20.** It was widely known that the Company had been experimenting with cost-efficient high fructose corn syrups ("HFCS"). However, HFCS previously had not been used in Coca-Cola because of concern about its effect on taste. HFCS–42, a "first generation" sweetener, was used in other Company products. *See Id.* at ¶ 13.

**21.** Plaintiffs identify Crawford Johnson, III, President of Coca-Cola Bottling Company United, as one of the first bottlers who proposed a substitute sweetener clause. His proposal would apply if the Company approved "corn syrups or any other sweetener." Dkt. 80, Exh. A (Fifth Affidavit of Emmet J. Bondurant). The Company identifies Robert Delauter, chief executive of the Coca-Cola Company of Portland, Indiana, as the first bottler who raised the issue of high fructose corn sweeteners. Dkt. 121, ¶¶ 3–5 (Affidavit of John A. Blanchard); Dkt. 121, ¶ 3 (Affidavit of Bob W. Delauter).

**22.** The actual language for the so called "sweetener savings pass through provision" was hammered out in July, 1978. Although early drafts referenced "high fructose syrups" and "technological developments," the final amendment referred simply to "another sweetening ingredient." Dkt. 121, ¶ 10 & Exhs. O–Q (Affidavit of John A. Blanchard). The exact text of the 1978 Amendment is quoted in full *infra* at 16.

**23.** *See, e.g.,* Dkt. 53, ¶ 3(f) (Fifth Affidavit of John Tiernan). The 1978 Amendment tied the price of Bottler's Syrup to a "sugar element," a

The Company mailed the final version of the 1978 Amendment to a group of selected bottlers, including John Tiernan, president of Presque Isle, in August, 1978. Tiernan signed the amendment on August 22, 1978. A week later the Company mailed the amendment, along with interpretive materials[24] to all Coca-Cola bottlers. Informational meetings followed, during which company executives tried to persuade bottlers, through a series of slide shows and other presentations, that signing the amendment would be economically beneficial. Plaintiff Alexandria executed the amendment on October 13, 1978.[25]

### C. Introducing diet Coke

The Company began selling TAB, a low calorie cola sweetened with saccharin, in 1963. After reviewing the growth potential of the diet soft-drink market, the Company determined that TAB, although a market leader, suffered from a relatively narrow market appeal.[26] In 1980, the Company began a two-year research project aimed at developing a diet product which could be sold under the Coca-Cola trademark.[27] On July 8, 1982, diet Coke was introduced with great fanfare. The name was chosen carefully, focusing on the descriptive nature of the term "diet" and the market recognition of the "Coke" trademark.[28] The public's response to diet Coke has been phenomenal.

The Company's public relations success has not been mirrored in its business dealings with some of the bottlers. As explained in the Court's recent opinion denying plaintiffs' motion for a preliminary injunction, the Company introduced diet Coke without consulting the bottlers or discussing marketing terms. 563 F.Supp. at 1128. The plaintiffs, among others, felt that the Company was obligated to provide syrup for diet Coke under the terms of the existing Bottler's Contracts, as amended in 1978, and that the Company was required to pass on the savings achieved by modifying the formula for Bottler's Coca-Cola Syrup.[29] The Company recognized that diet Coke could be sold only through its network of bottlers, but steadfastly refused to supply diet Coke under the new 1978 price terms.

On October 7, 1982, the Company began a two phase procedure for negotiating a contract for the sale of diet Coke. Phase I of the process required the execution of a Temporary Amendment to the Bottler's

---

"base element," and the Consumer Price Index: The Company was given the right to raise the base element in accordance with the Consumer Price Index, while the sugar element could be determined by the average per pound price publicly quoted by the largest refineries of granulated cane or beet sugar.

**24.** See Dkt. 53, Exh., ¶ 3(d) & Exh. D (Fifth Affidavit of John Tiernan).

**25.** In 1980, the Company began substituting HFCS–55 for approximately 50 percent of the granulated sugar in Bottler's Syrup. Under the terms of the price amendment, those bottlers who are parties to the 1978 agreement receive a pass-through of the savings realized by the substitution of HFCS–55. The use of this sweetener has spawned litigation in this Court by a group of unamended bottlers who claim that their contracts entitle them to Bottler's Syrup made only with granulated sugar. These unamended bottlers also claim that if the Company utilizes lower cost HFCS–55, they should be entitled to a pass-through of the realized savings. See Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co., 95 F.R.D. 168, 174 (D.Del.1982).

**26.** Dkt. 120, ¶ 4 & Exh. A (Revised Affidavit of Szapza Zyman).

**27.** The concept of a diet Coca-Cola was not entirely new. Some time in the mid-1970's the Company conducted a study about such a product. See Deposition of Szapaza Zyman, p. 159; Dkt. 115, Exh. C–1 (Seventh Affidavit of Emmet J. Bondurant).

**28.** See e.g., Dkt. 78, Exh. G (Fourth Affidavit of Emmet J. Bondurant).

**29.** The actual cost-saving is uncertain. Originally, the sweetening agent in diet Coke was saccharin, however, beginning in August, 1983, the Company began using a mixture of saccharin and aspartame, a nutritive sweetener recently approved by the Food and Drug Administration. The terms under which the Company purchases aspartame have not been disclosed. Plaintiffs estimate that the cost of the aspartame/saccharin mix is no more than 85¢ per gallon. Dkt. 112 at 72. The cost of HFCS–55/sugar mixture in January, 1984, was $1.576. Id. at n. 57.

Contract, which governed the pricing of diet Coke pending a final agreement on a permanent arrangement. Phase II involved negotiations toward permanent pricing and marketing of diet Coke and other new cola beverages. During the winter and early spring of 1983, the Company completed its Phase II negotiations and has recently introduced a "1983 Amendment."[30]

Until recently, plaintiffs did not have access to the new diet product. When the Phase I/Temporary Amendment was introduced, plaintiffs, among others, refused to sign or accept the terms of the amendment. The Company, in response, refused to provide diet Coke. Plaintiffs objected in particular to a clause in the Temporary Amendment, which erected an irrevocable waiver of the right to be reimbursed for overcharges in the event this Court decides that plaintiffs are entitled to syrup for diet Coke pursuant to their existing contracts or that plaintiffs are entitled to any pass through of savings from the use of saccharin and aspartame.[31]

This stand-off led the bottlers to file suit and move for a preliminary injunction which would allow them to purchase syrup for diet Coke without waiving their interim rights. In addition to preliminary relief, plaintiffs' complaint seeks a declaratory judgment establishing, among other things, that the Company is obligated to sell the syrup for diet Coke under the terms of the 1978 Amendment[32] and that the syrup used in diet Coke is Coca-Cola Bottler's Syrup within the meaning of the 1899 Contract, the 1921 Consent Decree, the plaintiffs' actual Bottler's Contracts and the 1978 Amendment. Following the Court's decision denying the requested preliminary relief, plaintiffs began bottling and selling diet Coke under the Temporary Amendment. Plaintiffs have now moved for summary judgment based on their amended contract.

## II. *Standard for Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment may be granted if the Court determines that no genuine issue of material fact remains for trial and that the moving party is entitled to judgment as a matter of law. The Third Circuit Court of Appeals has called Rule 56 a drastic remedy and has emphasized that courts must resolve any doubts about the existence of a material issue of fact against the moving party. *Tomalewski v. State Farm Insurance Co.,* 494 F.2d 882 (3d Cir.1974). The Court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion; if the non-movant's allegations conflict with those of the moving party, the former must receive the benefit of the doubt. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976).

To prevail on summary judgment in a contract action, the Court must be convinced that the contractual terms present only a question of law. "Discerning contractual intent," however is a question of fact unless the provisions of a contract are "wholly unambiguous." *Heyman v. Commerce and Industry Co.,* 524 F.2d 1317, 1320 (2d Cir.1975), *cited with approval in Landtect Corp. v. State Mutual Life Assurance Co. of America,* 605 F.2d 75, 79 (3d Cir.1979) (reversing grant of summary judgment).[33] In *Gerhart v. Henry Disston*

---

**30.** The 1983 Amendment incorporates significant changes in the Bottler's Contracts. It covers the sale and pricing of sugar free colas, caffeine free versions of Coke, diet Coke and Tab, other cola syrups, and existing and unknown future bottle syrups sold under the Coca-Cola trademark.

**31.** A copy of the Temporary Amendment is attached as Exhibit D to the Complaint, Dkt. 1.

**32.** In the alternative, plaintiffs seek a declaratory judgment that because the Company has breached the contract plaintiffs have the right to rescind the 1978 Amendment and return to their perpetual first-line contracts.

**33.** "The question of interpretation of language and conduct—the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law." 3 A. Corbin, *Corbin on Contracts* § 554 at 219 (1960). If, however, the words used in a contract are "definite and undisputed, and if there is no doubt as to the relevant

& Sons, 290 F.2d 778 (3d Cir.1961), the Third Circuit Court of Appeals explained that

> [a]n ambiguous contract is one capable of being understood in more senses that one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning. Before it can be said that no ambiguity exists, it must be concluded that the questioned words or language are capable of one interpretation.

Id. at 784 (citation omitted). See Portland Valve, Inc. v. Rockwood Systems Corp., 460 A.2d 1383, 1387 (Me.1983); 3 A. Corbin, Corbin on Contracts § 542, at 108–10 (1960); 4 S. Williston, Williston on Contracts § 609, at 402–04 (3d ed.1964).

In sum, to enter summary judgment in plaintiffs' favor, the Court must conclude that the contract presents only a question of law; that is, the Court must determine whether the language "is so clear that it can be read only one way." Landtect Corp. v. State Mutual Assurance Co. of America, 605 F.2d at 80. If defendant presents a reasonable reading of the contract which varies from that offered by plaintiffs, then a question of fact exists which can only be resolved through trial.

Several principles of contract interpretation are fundamental to the issues in this case.[34] The cardinal rule of construction is that courts are bound to enforce written contracts according to the "true intent" of the parties. Quintana Petroleum Corp. v. Alpha Investment Corp., 435 So.2d 1092, 1097 (La.Ct.App.1983). Intent is gleaned exclusively from the face of a written instrument if its terms are "clear, explicit and lead to no absurd consequences." Lewiston Firefighters Association v. City of Lewiston, 354 A.2d 154, 163 (Me.1976). However, if the terms of a contract can be

read in more than one way or "there is uncertainty or ambiguity as to its provision, or the intent of the parties cannot be ascertained from the language employed" parol or extrinsic evidence is admissible to resolve the ambiguity. Dixie Campers, Inc. v. Vesley Co., 398 So.2d 1087 (La. 1981).

### A.  Contract Terms at Issue

The 1978 Amendment incorporates a flexible formula for pricing Bottler's Syrup. The issue is whether paragraph 1(c) applies to the syrup used to bottle diet Coke:

> The Company and the Bottler are presently parties to the BOTTLER'S BOTTLE CONTRACT, as previously amended ("Bottle Contract"), and the BOTTLER'S PRE-MIX CONTRACT ("Pre-Mix Contract"), and they now find it in their mutual best economic interest to amend these agreements, in consideration of the provisions contained herein, as follows:
>
> 1. The Bottle Contract is hereby amended to delete those provisions which establish the price at which the Bottler purchases Bottle Syrup. In place of those provisions, the Company and the Bottler agree that the price of Coca-Cola Bottle Syrup shall be determined as follows:
>
> \*     \*     \*     \*     \*     \*
>
> (c) * * * In the event that the formula for Bottle Syrup is modified to replace sugar, in whole or in part, with another sweetening ingredient, the Company will modify the method for computing the Sugar Element in such a way as to give the Bottler the savings realized as a result of such modification through an appropriate objective quarterly measure of

surrounding circumstances, the interpretation of the words is ordinarily held to be a matter for the court." Id. at 225.

**34.** Substantive rules of contract law, such as the parol evidence rule, are determined by reference to state law. See Aetna Insurance Co. v. Newton, 274 F.Supp. 566, 570–71 (D.Del.1967), aff'd 456 F.2d 655 (3d Cir.1972). In this case,

the parties agree that under Delaware choice of law principles the law of Maine and Louisiana apply to Presque Isle's and Alexandria's contracts respectively. Plaintiffs also suggest that Georgia law is applicable. The contract laws of all three jurisdictions, however, take the same approach to the issues involved in these contracts.

the market price of any such sweetening ingredient. The Sugar Element would continue to fluctuate in the manner described above for sugar.

Plaintiffs recognize that their right to buy diet Coke under the amended contract is determined by the meaning assigned to the phrases "Coca-Cola Bottle Syrup" and "another sweetening ingredient." According to plaintiffs, diet Coke must be sold under the contract because it is made from "Coca-Cola Bottle Syrup" which has been modified by replacing sugar with a mixture of saccharin and aspartame. Although plaintiffs concede that the operative phrase "Bottle Syrup" is undefined, they argue that summary judgment nonetheless can be granted because the term has an "indisputable core meaning." The formula for Bottle Syrup, plaintiffs explain, has been modified many times and is not tied to any of the characteristics associated with regular Coca-Cola. Instead, plaintiffs argue, "Bottle Syrup" is a functional term and includes any carbonated, caramel colored cola sold under the Coca-Cola trademark.[35] Since aspartame and saccharin are "other sweeteners," and since the syrup used for diet Coke is "Bottle Syrup," plaintiffs conclude that the contract is unambiguous and that summary judgment should be granted.

The Company interprets the contract quite differently. According to defendant, the parties have always understood that "Bottle Syrup" was a reference to a single product, "traditional" Coca-Cola. Although the actual formula has changed over the years, the Company insists that "Coca-Cola Bottle Syrup" is a product defined by certain essential attributes. The contract does not include diet Coke, the Company argues, because it is fundamentally different from Coca-Cola. More importantly, notes the Company, plaintiffs can point to no evidence that in 1978 the parties intended to expand the subject of the contract by striking a bargain for the sale of a future, unknown diet product. Instead, the Company suggests the amendment reasonably can be read as making changes in specific contract terms such as pricing, marketing support, and arbitration. Relying on the history of the 1978 negotiations and other interpretive materials, the Company argues that summary judgment should be denied because there are disputed issues of fact concerning (1) whether the syrup used in diet Coke is Coca-Cola-Bottler's Syrup and (2) whether the parties in 1978 bargained for the sale of a diet product.[36]

---

**35.** Plaintiffs alternatively argue that "Bottle Syrup" includes any syrup used to bottle soft drinks sold under the Coca-Cola trademark. Dkt. 112 at p. 81 (Plaintiffs' Revised Opening Brief). For purposes of this motion, however, plaintiffs argue that the Court need only decide whether "Bottle Syrup" includes any carbonated, caramel-colored cola. *Id.* at 81–2.

Plaintiffs' instant legal theory is a departure from their approach during the preliminary injunction. At that time plaintiffs argued that diet Coke was "simply a version of a product which has undergone evolutionary change but which retains its identity as Coke," and "that any differences between Coke and diet Coke Bottler's Syrup are either insignificant or reflect attempts to achieve taste identity." 563 F.Supp. at 1130. It thus appeared that the preliminary issue was whether, in light of several indicia—including chemical composition, taste identity, marketing strategy and Company objectives—diet Coke "could be" Coke. Plaintiffs, as they are free to do, have abandoned that theory on summary judgment and now pursue an argument which would render irrelevant the entire question of "product identity." The Company, however, has

pursued the question of product identity and created a significant record in an attempt to controvert the factual bases for the preliminary injunction holding that diet Coke and Coke share much in common and that "for at least some purposes" the syrup used in diet Coke could be Coca-Cola Bottler's Syrup.

**36.** The Company also argues that the 1978 Amendment does not apply to diet Coke because saccharin and aspartame are not included in the phrase "another sweetening ingredient." This contention apparently has been abandoned. At oral argument counsel for the Company conceded that the 1978 Amendment does not limit the type of sweetening ingredient which could be covered by this clause. *See* Transcript of April 10, 1984, Oral Argument at pp. 97–99. (Dkt. 125). The Company contends, however, that the contract does not allow it to use another sweetener unless the substitute is "equally satisfactory," which they interpret as meaning any new sweetener could not be introduced if it "adversely affected" the taste and essential characteristics traditionally associated with Coca-Cola. The "equally satisfactory" qualification is

The Court concludes that plaintiff's summary judgment motion cannot be granted. The threshold question is whether "Coca-Cola Bottler Syrup" includes a category of cola syrups, or whether the phrase can reasonably be read as referring to a particular product. A four corners or facial approach to the contract cannot resolve that question. This is so primarily because the phrase "Bottle Syrup" is a "specialized trade term" and has meaning only to the contracting parties. Thus, to determine whether plaintiffs are entitled to diet Coke under their amended contracts, the Court must look to the nature of the parties business, their established course of dealing and, ultimately, the 1978 negotiations.[37] After examining the parol and extrinsic evidence submitted by the parties, the Court concludes that the question of product coverage is a disputed issue of fact which precludes summary judgment.[38]

## B. Is diet Coke made from "Coca-Cola Bottle Syrup"?

The phrase "Coca-Cola Bottle Syrup" was first coined in 1915 to distinguish the syrup used by the bottlers from the product used at soda fountains.[39] According to plaintiffs' characterization of the Company's subsequent course of dealing, "Coca-Cola Bottle Syrup" has become a functional term, and can include practically any cola sold under the Company's trademark. This proposed definition is premised primarily on the numerous changes in the formula for Coca-Cola,[40] the belief that some modifi-

---

not found in the 1978 Amendment. Rather, the term appears in contemporaneous Company literature used to explain the 1978 Amendment to the bottlers. See Dkt. 121, Exh. R (Affidavit of John A. Blanchard). Whether the contract includes such a limitation need not be decided in the present context. As the Company recognizes, the issue in this case is whether diet Coke is included within the phrase "Bottle Syrup" as the parties used that term in the 1978 Amendment. If diet Coke falls within that definition, it follows that any sweetener used in that product was "satisfactory" to the Company. The negotiations surrounding the substitute sweetener clause are, however, relevant to the Company's position that a diet product was not contemplated in 1978.

37. In *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir.1980), the Third Circuit Court of Appeals opined that disputes over commercial contracts often require the trial judge to consider extrinsic evidence, particularly when specialized terms are used:

Judges today come from a variety of backgrounds—private law practice, government service, business, academia—and their fields of experience represent an even wider variance. The parties who appear before the court in these times of complex commercial transactions come from a variety of specialized worlds of trade. It is the parties' linguistic reference that is relevant, not the judges'. The judge is in his or her linguistic field of expertise only when viewing words which lawyers have developed as terms of legal art. Even when the judge faces the need to interpret legal terms of art, extrinsic evidence and legal briefing are useful.

*Id.* at 1011–12 n. 12.

38. Because the Court finds that the contract is ambiguous, parol and extrinsic evidence is admissible to interpret the contract. *See, e.g., Dixie Campers, Inc. v. Vesely Co.*, 398 So.2d 1087, 1089 (La.1981). Plaintiffs' argument, that defendant's extrinsic evidence is not admissible because it seeks to vary or add to the contract, is thus without merit. Such evidence is necessary to determine the meaning of relevant terms and the parties' intent.

39. Until 1907 the Company manufactured a single form of Coca-Cola syrup for use in bottles and at soda fountains. When Thomas & Whitehead began bottling the syrup in 1899 they, as well as some first-line bottlers, discovered that the bottled product was not as sweet as the fountain product. Dkt. 109, Exh. O (Joint Affidavit of William Walter and John P. Marinan). To eliminate the difference in taste, the bottlers experimented with different syrup to water ratios. After consulting with Asa Candler, Thomas was allowed to add a "simple syrup" to the product sold by his first-line bottlers. This "simple syrup," which was prepared by Thomas or the bottlers, contained the artificial sweetener saccharin as well as "Coca-Cola coloring" and "Coca-Cola acid." *Id.* It is probable that the simple syrup added to Coca-Cola was not uniform. Following the Pure Food and Drug Act of 1906, which prohibited the use of saccharin in food products, the Company, in collaboration with the bottlers, removed saccharin and developed a separate syrup for bottled Coca-Cola. This new "Bottler's Syrup" contained more sugar coloring and acid than the fountain product. *Coca-Cola Co. v. J.G. Butler & Sons*, 229 F. 224, 226–27 (E.D.Ark.1916).

40. Some of the formula changes noted by plaintiffs are as follows: (1) in 1900 the process was

cations changed the product's characteristics, and the fact that the Company now sells two syrups under the existing Bottle Contracts.[41] Thus, plaintiffs assert, more than one type of syrup can be sold as "Coca-Cola Bottle Syrup."

Although it is undisputed that many significant changes in the Coca-Cola formula have occurred, plaintiffs' position on summary judgment is weakened by the fact that until 1980 only one product was sold under the Coke trademark. The language found in every contract, including the 1978 Amendment, arguably supports the Company's view that historically the phrase "Coca-Cola Bottle Syrup" was a reference to an existing product, well known to the parties.[42] The Company correctly argues that changes in the formula, therefore, cannot alone establish, as a matter of law, that the definition of Bottle Syrup was expanded as far as plaintiffs suggest. Such changes, according to the Company, were attempts to make bottled Coca-Cola taste more like the fountain product, were a response to changes in the Food and Drug Laws, or can be dismissed for summary judgment purposes as "evolutionary improvements" in the bottled product. On summary judgment, I cannot conclude that plaintiffs' expansive interpretation of "Bottle Syrup" should be incorporated into the contract as a matter of law.[43]

The 1978 negotiations also support the Company's view that the amended contract was to apply to Coca-Cola, not an unknown diet product. The affidavit of John A. Blanchard[44] explains that substitute sweetener clause was always discussed in the context of bottled Coca-Cola. Moreover, he states that no consideration was given to the "question of whether a newly formulat-

---

changed to eliminate the ¼00% of cocaine in Coke; (2) in 1906 the Company and bottlers agreed to eliminate the saccharin used by the bottlers and subsequently the Company agreed to increase the amount of sugar and other additives in 1907; (3) in 1917 the amount of caffeine was cut in half, from 1.21 grams per gallon to .62 grams per gallon; and (4) during World War I a number of sugar substitutes were used. Plaintiffs contend that the elimination of saccharin in 1906 probably affected the taste of Coca-Cola.

41. Following the introduction of HFCS–55 the Company began selling, under the existing Bottler's Contract, a form of Coca-Cola sweetened only with sucrose. This product, which must be specially ordered, is sold because it is kosher for Passover. Dkt. 115, Exhs. E–1 to E–5 (Seventh Affidavit of Emmet J. Bondurant). From this, plaintiffs would have the Court conclude that the Company's conduct establishes that more than one type of syrup can be sold under the contract. The Company notes that kosher syrup chemically is identical to non-kosher Coca-Cola, tastes the same and has the same high caloric value.

Plaintiffs further point out that a caffeine free version of Coca-Cola is also sold under the Bottler's Contract. It appears, however, that plaintiffs cannot rely on this course of dealing because of a letter agreement, which provides that the sale of caffeine free Coca-Cola shall not prejudice the Company's position in this litigation. Dkt. 121, ¶ 4 & Exh. C (Affidavit of Lawrence R. Cowart).

42. For example, the phrase "standard, high grade Bottlers Coca-Cola Syrup," used in the 1920 Consent Decrees suggests the parties were dealing with a specific product. Similarly, the plaintiffs' obligation not to use "any product that is a substitute for or an imitation of Coca-Cola" implies a standard product against which imitations could be measured. Finally, the 1978 Amendment contains no language to suggest that multiple syrups would be covered. Although the contract does contemplate changes in the Coca-Cola formula, the modifications are limited to changes in the sweetening ingredient.

43. The Company argues "Coca-Cola Bottle Syrup" reasonably can be defined in terms of certain "essential attributes," such as taste and high caloric value. Plaintiffs concede there are differences between Coke and diet Coke but contend that "consumer perception" has little or no relevance to the question of contract interpretation. Moreover, the bottlers argue, the contract does not tie "Bottle Syrup" to a particular product and as Justice Holmes observed, "Coca-Cola" "probably means to most persons" the Company's product "rather than a compound of particular substances." *The Coca-Cola Company v. Koke Company of America*, 254 U.S. 143, 146, 41 S.Ct. 113, 114, 65 L.Ed. 189 (1920). Because plaintiffs have not established that they are entitled to summary judgment, the Court need not decide whether, as the Company argues, "taste" and "caloric content" delimit the type of products which can be sold under the contract.

44. Blanchard was one of several executives who represented the Company during the 1978 negotiations. *See supra* note 18.

ed soft drink not previously produced by the Company would be considered 'Coca-Cola Bottle Syrup' within the meaning of the Coca-Cola Bottle Contract." [45]  Similarly, although the amended contract refers to "another sweetener" with no apparent limitation, the Company contends that those who proposed and drafted the substitute sweetener clause envisioned technologically advanced high fructose sweeteners which would not change the taste of Coke.[46]  According to Company officials the parties were not thinking about the possible development of a product sweetened with saccharin or aspartame, two sweeteners in existence at the time of the contract.[47]  In addition, although the question of low calorie sweeteners may have been discussed in isolated instances, the topic was not pursued in 1978 because the Company was concerned about potential congressional bans on saccharin and cyclamates.[48]

Finally, the Company's strategy when selling the amendment to recalcitrant bottlers reveals no reference to future low calorie Coca-Cola products.  Although the materials used to explain the 1978 Amendment stressed that the new price formula would provide a permanent solution to the price problem[49] and guaranteed that future savings would be passed along if a new non-sucrose sweetener were used,[50] no doc-

ument expressly states that a new generation of diet products would also be covered by the 1978 pricing formula.  On summary judgment, the absence of any reference to diet products supports the Company's position that no agreement was reached in 1978.  If the parties had negotiated a price agreement for diet products, such a development would have been highlighted during the informational meetings.

### C.  *Conclusion*

Plaintiffs have not established as a matter of law that diet Coke is included within the phrase "Coca-Cola Bottle Syrup."  The scope of products covered by the 1978 Amendment to plaintiffs' contract is a disputed issue of fact which precludes summary judgment.

---

**45.**  Dkt. 121, ¶ 17.

**46.**  Bob W. Delauter, a bottler involved in the substitute sweetener negotiations, explains that the other sweetener clause was always discussed in the context of future developments in fructose.  Dkt. 121, ¶ 5 & Exh. C (Affidavit of Bob W. Delauter).  Proposed drafts of the sweetener savings clause support Delauter's account of the negotiation.  *See* Dkt. 121, ¶ 16 & Exh. N (Affidavit of John A. Blanchard).

**47.**  John Tiernan, president of plaintiff Presque Isle, stated in his deposition that he recalls discussing fructose, but not saccharin or any other low calorie sweetener.  Tiernan does not recall if the Company said a low calorie product would fall within the 1978 Amendment.  *See* Dkt. 100, pp. 763–67.

**48.**  For example, I.L. Thomas, chairman of plaintiff Alexandria, stated in his deposition that he raised the question of saccharin and cyclamates in discussions with Company executives.  Dkt.

99, pp. 35–7;  85–6.  John W. Allison, an executive vice president of Alexandria, explained in his affidavit that he thought the 1978 Amendment applied to any sweetener, particularly cyclamates.  Dkt. 55.  Donald Keough, a Company executive vice president, however denies telling Thomas that saccharin and other low calorie sweeteners were to be included in the substitute sweetener provision.  Dkt. 121, ¶ 2 (Affidavit of Donald R. Keough).

The parties agree that the question of "sugar free Coke" was discussed in a regional meeting of bottlers in Dallas, Texas on May 16, 1978.  Dkt. 80, Exh. B (Fifth Affidavit of Emmet J. Bondurant).  Company notes, however, show that J. Lucias Smith, then Company president, did not want to discuss the issue until the "saccharin issue" was cleared up.  *Id.*

**49.**  *See, e.g.,* Dkt. 53, ¶ 3(e) & Exh. E (Fifth Affidavit of John Tiernan).

**50.**  *Id.* at ¶ 3(f) & Exh. F.